2022 IL App (1st) 190812-U

No. 1-19-0812

Order filed February 15, 2022.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2013 CR 19655 |
| | ) | |
| MARKEAS BROWN, | ) | The Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly prohibited defendant from testifying regarding another individual's out-of-court confession. In addition, the State's inadvertent violation of the court's motion *in limine* ruling was harmless. Furthermore, the record did not support defendant's claim that his sentence was unconstitutional, that trial counsel was ineffective for failing to raise that argument, or that counsel was ineffective for failing to seek a sentencing continuance.

¶ 2    Following a jury trial, defendant Markeas Brown was found guilty of the first-degree

murder of Daquan Boyd and the attempted murder of Lomeck Johnson. On appeal, defendant

asserts that the trial court improperly denied his right to present a complete defense by excluding

his testimony regarding another individual's out-of-court confession. Defendant also asserts that reversible error occurred during closing argument when the State inadvertently played an unredacted video of his interrogation that contained other crimes evidence. Additionally, he contends that his sentence was unconstitutional and trial counsel was ineffective at sentencing. For the following reasons, we affirm the trial court's judgment.

¶ 3                                  I. Background

¶ 4     On August 17, 2013, after spending the evening at the Taste of Austin, Boyd and Johnson were shot by two perpetrators riding bicycles. Boyd, who sustained extensive injures to his back, diaphragm, lung and heart, did not survive. Johnson sustained gunshot wounds to his left side, lumbar spine and left femur as well as a fracture to his femur. While surveillance footage showed two individuals acting together, defendant was the only person charged in this offense.

¶ 5     Before trial, the court entered an agreed order on defendant's motion *in limine*, which required the State to show the jury a redacted version of defendant's interrogation video. The redacted video excluded references to defendant being on parole, being the subject of an arrest warrant, or being adjudicated a juvenile delinquent. The redacted video also excluded references to defendant skipping school, selling drugs or being on the run.

¶ 6     At trial, Johnson, then 23 years old, testified that on the night in question, he and Boyd went to the Taste of Austin, then to Boyd's home and, finally, to Johnson's home, located at 5 South Parkside. While they were standing outside at 11:30 p.m., a man on a bicycle rode toward them on the sidewalk. Under "[p]retty visible" lighting conditions, Johnson saw that the man wore a red shirt, blue pants and a tan or khaki fisherman hat. In court, Johnson identified that man as defendant. From about two feet away, defendant said or asked, "was you hood rich." Boyd answered but Johnson was unable to because defendant and a second man on the street

began shooting at them. Defendant fired four or five times. While Johnson could hear that a second person was shooting, Johnson never looked at him. The victims tried to run away but Boyd fell, and Johnson went into shock. Johnson testified that a surveillance video of the scene accurately showed what occurred.

¶ 7     At the hospital, Johnson told detectives that defendant was a black male, between 18 and 20 years of age, and between 5'6" and 5'9" tall. He wore a large earring, red shirt, black cap and blue jeans. Johnson did not describe defendant's face or complexion but did tell detectives that he had seen defendant before, although he could not then recall where. Johnson was released from the hospital the following day.

¶ 8     After speaking with friends, Johnson realized that he had gone to DePriest Elementary School with defendant, whose nickname was Snooky and whose his first name began with the letter M, but he could not remember defendant's legal name. Johnson, who had last seen defendant earlier that summer, did not immediately call the police to inform them of his realization, but did provide the police with this information at his home on August 20, 2013. He also told the police that defendant had been in his fifth-grade class. Two days later, Johnson was "[a]bsolutely 100 percent" certain when he identified defendant from a photo lineup as the person who shot at him and Boyd. According to Johnson, he never forgot defendant's face because he knew him. In September 2013, Johnson identified defendant from a lineup with absolute certainty and testified before a grand jury. As of trial, Johnson was still "100% positive" that defendant was the person he saw shoot at him and Boyd.

¶ 9     Evidence showed that Erick Powell also spoke to the police and testified before the grand jury. By the time of defendant's trial, however, Powell denied remembering any information pertinent to this case, and then some. Powell testified that he remembered nothing about day in

question, did not see a shooting that night, and did not know defendant. In contrast, Detective Joseph Marszalec testified that Powell identified "Snooky" from a photo array and wrote, "saw him shoot."

¶ 10    According to the testimony of Assistant State's Attorney Christina Brewer, Powell testified before the grand jury that he was riding a bicycle to the Taste of Austin when he saw Snooky, whom Powell knew from the neighborhood. Snooky and another man were on their own bicycles. Powell, who was going the same direction, followed them because he wanted to see what they were up to. Snooky, wearing a fisherman hat, jumped onto the sidewalk on Parkside and started shooting at Boyd. Powell did not see whether defendant's companion was shooting, however. According to Powell's grand jury testimony, he recognized "James" from a lineup as the other person riding a bicycle that night.

¶ 11    Forensic evidence generally showed that three cartridge cases, two bullets and certain bullet fragments recovered at the scene were fired from the same .380-caliber firearm. A .22-caliber bullet recovered from Boyd's body could not have been fired from the same weapon.

¶ 12    Sergeant Hawkins testified that at about 2:10 p.m. on September 9, 2013, he and other members of the fugitive apprehension team went to 556 North LaVergne in search of defendant. Officer Walsh reported that he heard an individual run down the back stairs of the building. The officers ultimately forced entry to a locked basement door and arrested defendant, who was found standing in the middle of the room.

¶ 13    Sergeant Russel Egan testified that at about 3:12 p.m. on September 9, 2013, he and Detective Vincent Alonzo met with defendant until about 4 p.m. After determining that recording footage of the interview was of poor quality, the detectives moved defendant to a different interview room. Sergeant Egan, Detective Alonzo and Detective Marszalec spoke with

defendant intermittently between about 5:46 p.m. and 7:04 p.m. The redacted video of defendant's interview was published for the jury.

¶ 14     That video showed that defendant first denied knowledge of shooting and claimed that he was at the home of his son's mother that night. He also denied that he had ever shot a gun but acknowledged owning a white fisherman's hat. Subsequently, defendant told detectives that the shooting involved Lil' James, whose legal name was James Dixon, and an argument involving the "Hood Ridge boys" at the Taste of Austin.[1] In addition, he admitted being at the scene but denied shooting. Defendant further stated that there were six people present with various firearms and he was the only one with a .32-caliber Colt revolver, which held two bullets.

¶ 15     Next, defendant told the police that the first time he and his companions cycled past the scene, the Hood Ridge boys threw bottles and bricks at them. They then procured four automatic weapons and one revolver from a house and returned to the scene. Defendant admitted that he was wearing a floppy hat but denied shooting the revolver. At one point, defendant stated that "Erick" was also one of the shooters. Finally, defendant admitted that upon returning to the scene, he rode his bike on the sidewalk and shot twice at the victims.

¶ 16     Defendant, who was 18 years old at the time of the offense, testified that on the afternoon of August 17, 2013, he went to the home of Angelique Gross, his son's mother. Gross's own mother, Benita Watson, also lived there. That afternoon, Dixon, a former friend, called defendant's cell phone and told him that something would occur later at Parkside and Madison. Dixon said he "got into it with" someone and needed defendant "to come ride with" him. Defendant declined and stayed at Gross's home all day. At about 2 or 3 p.m., defendant's own

---

[1]We note the phonetic similarity of "hood rich," testified to by Johnson, and "Hood Ridge," referred to in defendant's interview.

mother joined them and stayed until about 9 or 9:30 p.m. At around 11 p.m., they ate a roast that Watson had cooked.

¶ 17     At about 9 or 10 a.m. the next morning, defendant returned to his grandmother's house, where he and other family members lived. Many people were in the area, including Dixon and "Erick." In the presence of Erick and others, Dixon told defendant what had happened the night before. Later the same day, defendant had a second conversation with Dixon about what had happened the previous day. While defense counsel was questioning defendant about the first conversation he had with Dixon, the following ensued:

> "Q. Okay. Did you ever hear -- so when you say he told you about what happened, what was he -- what are you talking about?
>
> MS. SULLIVAN [ASSISTANT STATE'S ATTORNEY]: Objection.
>
> THE WITNESS: He was talking --
>
> THE COURT: Sustained. Folks, by way of explanation, the evidence that's being solicited would be hearsay not with an exception. There's sort of exceptions to the hearsay rule. Just repeating what somebody else told you is hearsay."

¶ 18     At a side bar, defense counsel argued that the hearsay rule could not be used to mechanically thwart a defense and, because the State elicited evidence that Dixon participated in the shooting, it would be "a misapplication of the hearsay rule to exclude testimony about what [Dixon] might have said about his participation in this crime." Following a discussion off the record in chambers, the court remarked on defendant's reliance on *People v. Tenney*, 205 Ill. 2d 411 (2002):

"[I]t talks about mechanically applying the hearsay rule to exclude certain evidence, but it also eludes to the fact that in order for that exception to exist, there has to be something inherently trustworthy about the conversation when it occurs.

Now, as I understand it, this conversation is occurring the next day, far removed from the incident when this crime is alleged to have occurred, and the Defendant's theory of the case is that the information provided during this conversation became the information they would later go on to tell the police, that he would later go on to tell the police, his statement to the police, which I have now seen is highly factually diverse and transient in nature. I watched him to go from a complete denial to a really reluctant admission and acceptance and acknowledgment of his conduct, and what that all does, it sheds profoundly dark light upon the assertion that I am applying the hearsay rule mechanically here. In fact, quite to the contrary. I cannot use the *Tenney* case because I don't believe that the indica of reliability exists here as they did in *Tenney*."

¶ 19    Defendant continued to testify that on the way to the police station following his arrest, one detective said, "if I was you, I wouldn't go down for nothing that you didn't do." The detective said, "just do what you got to do," which defendant took to mean he should implicate someone. In addition, the detective said that if defendant did that, he would not be charged. In the first room at the police station, he "told them everything." Specifically, he said he was at Gross's home and had nothing to do with the crime. In the second room, which was extremely cold, the police told him that a video showed him shooting someone, but he did not see that video. He told the police they were wrong because he was not at the shooting.

¶ 20    That being said, defendant subsequently told the police that he was at the scene and fired a gun. Defendant, who was cold, frustrated and scared, thought that if he told the police he fired

a gun at the scene "but it wasn't the gun that actually did it, then maybe I -- they'll just find out I'm lying to them and let me go." The information he gave the police came from Dixon, although defendant fabricated his statement that six people with guns were present. Defendant believed he could outsmart the police.

>"I know how it sound right now on the stand. It sound stupid. I just -- I was young. I made a mistake. I thought that was going to get me out of something and it really got me into something. It really got me sitting here feeling I could possibly lose my life."

Defendant testified that although he told police that he fired at the victims, defendant never said he actually shot anyone.

¶ 21     According to defendant, he repeatedly asked the police what type of guns were used in the shooting because he was trying to determine whether they came from "Auntie Gina's" house, where Dixon and others had previously obtained guns. Defendant denied asking for that information because he knew the type of gun he himself had used. In addition, defendant denied knowing either victim, although he did attend DePriest for part of the 8th grade. He also denied being present at the scene, shooting anyone, knowing Powell or owning a floppy hat in August 2017.

¶ 22     Benita Watson testified that she met defendant when he started dating her daughter in 2011. On August 17, 2013, defendant, his mother, his uncle and his two cousins came over. His mother stayed until about 9 or 9:30 p.m. Watson was about to get defendant's son ready for bed when Gross said she was hungry. Watson put a roast in the oven and joined defendant on the porch, checking the roast intermittently. When Watson took the roast out of the oven at almost 2 a.m., Gross had fallen asleep. Watson denied telling Cook County State's Attorney Investigator

Michael Connelly that she did not want to be interviewed or answer questions. The parties subsequently stipulated, however, that Connelly would testify to the contrary.

¶ 23    During closing argument, the State played clips of the unredacted video of defendant's interview and defense counsel moved for a mistrial. She argued that in the footage improperly played for the jury, defendant said, "I went to parole officer to baby mama's house that I wasn't going to school. Shit. So she, mom, tried to lock me up so I ran. That's how I caught the warrant." The court denied defendant's motion:

> "I will indicate that his manner of speaking, he's very difficult to understand. In any event, even understanding and now hearing the words, *** I don't think the State -- perhaps it was clerical error. It had been included among the things which had originally been omitted from the statement that the jury was going to be allowed to see, but I don't think it's that prejudicial."

¶ 24    The jury then found defendant guilty of first-degree murder and attempted first-degree murder. The jury also found that during the commission of both offenses, he was armed with a firearm. The trial court subsequently denied defendant's motion for a new trial.

¶ 25    At sentencing, the parties agreed that the minimum sentence for first-degree murder was 20 years, the minimum sentence for attempted murder was 6 years, and both sentences carried 15-year firearm enhancements and were to be served consecutively. In addition, defense counsel requested that defendant be sentenced under the Parole-Appeal and Review Act, which we note would not take effect for almost two months, and defense counsel did not suggest how the court might apply that act to this case. In elocution, defendant stated, "I apologize for what happened. I just wish they got the right guy."

¶ 26    The trial court acknowledged that defendant came from an extremely challenged community but disagreed "that there aren't individuals in that same circumstance that never even darken the doorways of this building. There are thousands and thousands of young men in his age group that never are involved in anything remotely similar to what the defendant is involved in in this case." In addition, Boyd was doing nothing when defendant rode by on a bicycle and executed him at point blank range. Furthermore, the legislature was trying to curb indiscriminate, lawless behavior by individuals who "arm themselves at crazily young ages." While the court took no joy in having to sentence defendant, the mandatory minimum sentence did not correspond to the seriousness of the offense. Accordingly, the court sentenced defendant to 30 years in prison for murder, which was 10 years above the minimum, 6 years in prison for attempted murder and two 15-year firearm enhances, to be served consecutively for a cumulative sentence of 66 years in prison.

¶ 27                                    II. Analysis

¶ 28    On appeal, defendant first asserts that the trial court denied him his right to present a complete defense by prohibiting defense counsel from questioning him regarding Dixon's admissions after the shooting.

¶ 29    A criminal defendant is constitutionally entitled to a meaningful opportunity to present a complete defense. *People v. Burgess*, 2015 Il App (1st) 130657, ¶ 133. When a defendant claims that improper evidentiary rulings denied him that right, we review the trial court's rulings for an abuse of discretion, which occurs when no reasonable person would take the court's view. *Id.* ¶¶ 133-34; see also *People v. Anderson*, 367 Ill. App. 3d 653, 667 (2006) (finding no abuse of discretion even if other judges may have ruled differently).

¶ 30    A declarant's unsworn, out-of-court statement that he committed the crime the defendant has been charged with is generally inadmissible hearsay, notwithstanding that the statement was against the declarant's penal interest. *People v. McCallister*, 193 Ill. 2d 63, 100 (2000). Were it otherwise, everyone accused of a crime would be tempted to introduce perjured testimony that a third party beyond the reach of the court had declared that he, rather than the accused, was the true culprit. *People v. Tenney*, 205 Ill. 2d 411, 433-34 (2002). Yet, the hearsay rule cannot be mechanically applied to defeat justice. *Id.* at 434. Such extrajudicial statements may be admitted pursuant to the statement-against-penal-interest exception where there are sufficient indicia that the extrajudicial statements are trustworthy. *People v. Bowel*, 111 Ill.2d 58, 66 (1986) (citing *Chambers v Mississippi*, 410 U.S. 284, 302 (1973)).

¶ 31    A declaration may be sufficiently trustworthy where (1) the declarant spontaneously made the statement to a close acquaintance shortly after the crime; (2) other evidence corroborated the statement; (3) the declarant's statement was self-incriminating and against his interests; and (4) an adequate opportunity to cross-examine the declarant exists. *Bowel*, 111 Ill. 2d at 66-67 (citing *Chambers*, 410 U.S. at 300-01). While such factors are indicia of trustworthiness, they are not hard and fast requirements. *McCallister*, 193 Ill. 2d at 100. A defendant is not required to establish all four factors. *People v. Thomas*, 171 Ill. 2d 207, 216 (1996). The ultimate question is whether the circumstances under which the declaration was made involved objective indicia of trustworthiness that provide considerable assurance of the statement's reliability. *McCallister*, 193 Ill. 2d at 100. Consistent with these principles, Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011) provides:

> "A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or

criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

¶ 32    Despite the trial court's finding to the contrary, the State concedes that the first factor-whether the statement was made spontaneously to a close acquaintance after the crime- favors admission. The parties also agree that the third factor-whether the statement was against Dixon's penal interest- favors admission, but the fourth factor -whether the witness is subject to cross-examination- does not. Thus, the parties' dispute focuses on the second factor, whether sufficient evidence corroborates the statement.

¶ 33    The import of Dixon's alleged statement is that he, *to the exclusion of defendant*, participated in this shooting. If the statement merely acknowledged Dixon's involvement without implying that defendant was not involved, defendant would have no use for it. While defendant points to several instances in the record indicating that Dixon was the shooter in the middle of the street, nothing corroborates Dixon's suggestion that defendant was not the other shooter, aside from defendant's self-serving statement initially made to the police. In short, the trustworthiness of Dixon's out-of-court statement is undermined by its source, defendant, who was the sole witness to the statement and the sole person to potentially benefit from it. See also *People v. Cunningham*, 267 Ill. App. 3d 1009, 1016 (1994) (finding it significant that the defense investigator to whom the statement was made had a direct interest in the case); *People v. Villegas*, 222 Ill. App. 3d 546, 552 (1991) (finding that the witnesses who would testify to the declarant's statements had a defense bias as they were all related to the defendant); but see

*People v. Swaggirt*, 282 Ill. App. 3d 692, 702-03 (1996) (finding that the source of corroborating evidence need not be prosecution witnesses and that the *Chambers'* factors do not involve credibility determinations and that "[i]f the testimony of defendant's witnesses is suspect, then this fact goes to the weight to be accorded such testimony rather than to its admissibility").

¶ 34    We return to the purpose of the general rule excluding a declarant's unsworn, out-of-court statement that he committed the crime the defendant has been charged with. If the circumstances before us were sufficient to put Dixon's statement before the jury, every criminal defendant would be tempted to introduce perjured testimony that an unavailable witness had declared that he, rather than the defendant, was the true culprit. *Tenney*, 205 Ill. 2d at 433-34. We find no abuse of discretion.

¶ 35                                B. Other Crimes Evidence

¶ 36    Next, defendant asserts that the State violated the agreed order to exclude other crimes evidence and that this error was not harmless. During closing argument, rather than playing the redacted version of the interview recording, the State played portions of the unredacted one. While the State concedes that it violated the order, albeit inadvertently, the State maintains that the error was harmless.

¶ 37    Evidence of other crimes is inadmissible for the purpose of establishing the defendant's propensity to engage in criminal activity, as such evidence might lead the jury to convict the defendant for being a bad person deserving punishment. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1996); *People v. Richee*, 355 Ill. App. 3d 43, 50-51 (2005). Such evidence can include crimes or acts for which the defendant was not charged. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 28. Yet, our supreme court has repeatedly held that the improper introduction of other-crimes evidence constitutes harmless error where the defendant was neither prejudiced nor

- 13 -

denied a fair trial by admission. *People v. Nieves*, 193 Ill. 2d 513, 530-31 (2000). Such error "is harmless if there is substantial evidence of the defendant's guilt." *Sims*, 2019 IL App (3d) 170417, ¶ 30. Stated differently, reversal is unwarranted if the evidence was unlikely to have influenced the jury. *People v. Cortes*, 181 Ill.2d 249, 285 (1998).

¶ 38     Defendant suggests that because these statements were redacted from the video to avoid prejudice to defendant, it is a foregone conclusion that publishing these statements to the jury was prejudicial and not harmless. While the parties and the trial court were certainly concerned about *potential* prejudice from such statements, it does not follow that actual prejudice materialized.

¶ 39     First, we agree with the trial court's finding that defendant's words on the video are very difficult to understand. Even if the jury was able to make out what defendant was saying, these passing remarks were brief and followed the conclusion of evidence. In addition, jurors may or may not have understood defendant's meaning when he said that Watson "tried to lock me up," or understood what it means to "catch a warrant." Moreover, the evidence in this case was substantial. See *Nieves*, 193 Ill. 2d at 531 (finding the potential prejudicial effect "produced by this one isolated and cryptic reference to defendant's criminal activity in New York was overshadowed by the substantial evidence of defendant's guilt").

¶ 40     Johnson, who was in defendant's fifth grade class, recognized him as the shooter and was unwavering in his certainty. While the encounter was brief, the surveillance video supports Johnson's testimony that lighting conditions were "[p]retty visible." Even at the hospital, Johnson told the police he had seen the offender before, although he was only able to come up with a name and context for defendant after speaking to friends. Additionally, shortly after the shooting, Powell testified before the grand jury that he saw defendant shoot at Boyd. Given the

extent of Powell's professed lack of knowledge or memory at trial, we find it extremely unlikely that a jury would find his trial testimony to be more credible.

¶ 41 Finally, despite the everchanging account he gave the police, defendant ultimately admitted that he rode his bicycle onto the sidewalk and fired twice at the victims. Defendant argues that his initial statement to police corroborated his trial testimony that he was at the home of Watson and Gross at the time of shooting. Yet, he underestimates the strength of the eyewitness accounts of Johnson and Powell, who, consistent with defendant's eventual confession, identified him as the shooter on the sidewalk. *Cf. People v. Mullen*, 141 Ill. 2d 394, 402-406 (1990) (finding the prosecutor's deliberate reference to a forbidden subject during closing argument was egregious and prejudicial where it suggested that the defendant threatened or intimidated witnesses out of testifying, where numerous discrepancies existed between the defendant's confession and eyewitness testimony and where the defendant said the victim was shot in the head although he was actually shot in the back). We also find the jury would be aware that as the grandmother of defendant's child, Watson had a natural bias in favor of defendant and had a motive to place him at her home on the night of the shooting. In short, it is unlikely that the brief references to other crimes evidence during closing argument influenced the jury's verdict. The error was harmless.

¶ 42                                  C. *Miller v. Alabama*

¶ 43 Defendant, who was 18 years old at the time of the offense, next asserts that the trial court failed to consider the unique characteristics of juvenile offenders before imposing a cumulative 66-year sentence. He contends that as a result, his sentence violates the proportionate penalties clause.

¶ 44    The United States Supreme Court has determined that under the eighth amendment to the United States Constitution, children are constitutionally different from adults. *People v. Dorsey*, 2021 IL 123010, ¶ 37 (citing *Miller v. Alabama*, 567 U.S. 460, 471 (2012)). Consequently, before determining that a life sentence without parole is a proportionate sentence for a juvenile, the sentencing court must consider the juvenile's youth and attendant characteristics. *Dorsey*, 2021 IL 123010, ¶ 40 (citing *Montgomery v. Louisiana*, 577 U.S. 190, 209-10 (2016)).

¶ 45    Defendant concedes that at 18 years of age, he was not a juvenile offender. Yet, he contends that as a young adult, juvenile sentencing factors apply with equal force to his sentence and that his *de facto* life sentence, imposed without considering juvenile sentencing factors, is unconstitutional as applied under Illinois' proportionate penalties clause. That clause states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art.1, § 11.

¶ 46    The record before us does not support defendant's as-applied claim, as it contains no information about how science applies to defendant's specific case. See *People v. House*, 2021 IL 125124, ¶¶ 27-31 (rejecting the defendant's as-applied constitutional challenge where the defendant "did not provide or cite any evidence relating to how the evolving science on juvenile maturity and brain development applies to his specific facts and circumstances"); *People v. Harris*, 2018 IL 121932, ¶ 46 (finding that the record contained no "evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances"); *People v. Thompson*, 2015 IL 118151, ¶ 38 (similar). Accordingly, we find no error.

¶ 47    Recognizing potential difficulty with the record, defendant urges us to reverse and remand this case for an evidentiary hearing on defendant's claim. In *Harris* , which involved a

direct appeal, our supreme court specifically declined to do so. See *Harris*, 2018 IL 121932, ¶¶ 47-48; but see *People v. Jones*, 2021 IL App (1st) 180996, ¶¶ 14-35 (finding that judicial economy rendered it appropriate on direct appeal to vacate the defendant's sentence and remand to the trial court to develop a record as to whether the 50-year sentenced imposed for a crime committed at age 19 was unconstitutional as applied to this defendant). We find it appropriate to follow our supreme court's lead and decline defendant's request.

¶ 48    Defendant alternatively contends that trial counsel was ineffective for failing to raise this claim below. To demonstrate that trial counsel was ineffective, a defendant must show that counsel's performance was deficient and caused prejudice.[2] *People v. Pope*, 2020 IL App (4th) 180773, ¶ 61. The record, however, does not reveal what evidence, if any, was available to defense counsel to support defendant's claim that he in particular was constitutionally required to be sentenced in the same manner as a juvenile. Without knowing the strength of such evidence, we cannot say that trial counsel was deficient for failing to bring it to the trial court's attention or that defendant would have received a more favorable sentence had trial counsel done so. Moreover, where defendant has not shown his entitlement to the protections of *Miller*, he had not shown error, let alone second-prong plain error. See *People v. Mudd*, 2021 IL 126830, ¶ 22 (stating that a defendant must demonstrate error serious enough to affect the fairness of his trial or undermine the integrity of the judicial process).

¶ 49                     D. The Parole-Appeal and Review Act

¶ 50    Finally, defendant asserts that trial counsel was ineffective for failing to seek a continuance so that defendant could take advantage of new legislation which had yet to take

---

[2]We categorically reject defendant's suggestion that this is the rare case where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," excusing the defendant from showing prejudice. *United States v. Chronic*, 466 U.S. 648, 659 (1984).

effect. As stated, defendant must show both that trial counsel's performance was deficient, and that this deficient performance caused prejudice. *Pope*, 2020 IL App (4th) 180773, ¶ 61.

¶ 51    On April 1,  2019, the governor signed the Parole-Appeal and Review Act. Pub. Act 100-1182, § (eff. June 1, 2019). That act implemented parole review for individuals who were under 21 years of age at the time of their offense, making many defendants eligible for parole review after serving 10 years in prison. 730 ILCS 5/5-4.5-115(b) (West 2020). That being said, section 5-4.5-115(b) expressly applies to individuals sentenced on or after June 1, 2019, the act's effective date. 730 ILCS 5/5-4.5-115(b) (West 2020). Defendant's sentencing hearing occurred on April 4, 2019, just three days after the legislation was signed but almost two months before the act was to take effect. Without the benefit of this new legislation, defendant must serve 100% of his 45-year sentence for first degree murder, and 85% of his 21-year sentence for attempted first degree murder. 730 ILCS 5/3-6-3(a)(2)(i), (ii) (West 2014).

¶ 52    The record shows that defense counsel explicitly asked the trial court to sentence defendant under this new act but did not specify how the court could do so. It is unclear whether the trial court would have understood this to be a request for a continuance. If it did, the request was implicitly denied. Assuming the court did not consider this to be a motion for a continuance, defendant cannot show a reasonable likelihood exists that the court would have granted such a motion.

¶ 53    In deciding whether to grant a continuance, a matter within the trial court's discretion, the court may consider, among other things, the history of the case, the complexity of the matter, docket management and inconvenience to the parties and witnesses. *People v. Walker*, 232 Ill. 2d 113, 125-26 (2009). As defendant observes, only 37 days had passed between the finding of guilt and the sentencing hearing on April 4, 2019. Yet, the present offense incurred in August 2013,

over five years earlier. While this delay is not entirely attributable to defendant, the court was nonetheless entitled to consider the effect of this outstanding case on the parties, Johnson, the victims' families, the sentencing witnesses and the court's docket. Defendant has not shown a reasonable likelihood exists that the court would have granted a continuance of almost two months for defendant to take advantage of legislation that the legislature had not otherwise endeavored to make applicable to defendant. *Cf. United States v. Abney*, 812 F.3d 1079, 1082-83, 1092-95 (D.C. Cir. 2016) (finding that where the defendant was sentenced five days after Congress passed the Federal Sentencing Act, which would have cut the minimum sentence in half, where defense attorneys were routinely seeking continuances to benefit from that act, and where the trial court stated it would have imposed a lesser sentence if it had discretion to do so, a reasonable probability existed that an impartial judge would have granted a continuance had defense counsel asked); see also *Downs v. United States*, 879 F.3d 688, 690-91 (6th Cir. 2018) (disagreeing with *Abney's* determination that counsel's performance was deficient). Because defendant cannot establish prejudice, he cannot show that trial counsel was ineffective.

¶ 54                                    III. Conclusion

¶ 55    For the foregoing reasons, we affirm the trial court's judgment.

¶ 56    Affirmed.