THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONNIE G. VANDIVER, Defendant-Appellant.

First District (4th Division)   No. 82—3109

Opinion filed August 23, 1984.—Rehearing denied September 13, 1984.

Frazin & Fisher, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LINN delivered the opinion of the court:
Defendant, Ronnie G. Vandiver, was charged by indictment with the murder of Goldie Hibbs. Following a bench trial, defendant was found guilty of murder and was sentenced to 40 years in the Illinois Department of Corrections.

On appeal, defendant claims that (1) the State failed to prove him guilty of murder beyond a reasonable doubt, (2) the trial court abused its discretion by allowing the use of two interpreters for a deaf-mute witness and thereby violated defendant's sixth amendment right to confront witnesses against him, and (3) the trial court erred in admitting evidence of an aggravated battery to which defendant had pleaded guilty.

We affirm the decision of the trial court.

FACTS

Testimony adduced at trial established that on November 14, 1981, defendant was employed as a bouncer at a Cicero, Illinois, tavern called the Hollywood Lounge. After going out for the evening with his aunt and uncle and having a few drinks, he reported for work at 2 a.m., had a few more drinks, played some pool, and talked for a while with the barmaid and the tavern's owner, Travis Tidwell.

At approximately 5 a.m., while some of the customers in the bar were dancing, an older man named Goldie Hibbs, who had been dancing by himself, bumped into a table, knocked over a glass, and fell to the floor. Hearing the thud, defendant moved around the end of the bar and saw Tidwell help Hibbs to his feet and take him outside through the side door. Defendant followed, along with several other patrons of the bar.

The key witness for the State was Timothy Justice, a 27-year-old deaf-mute, who testified by means of two interpreters. He stated that, as he sat with two women at a table near the back door, he became aware of a commotion as several of the bar's patrons moved toward the spot where Hibbs had fallen. He then saw defendant and another man drag Hibbs out the door near him. Justice testified that he watched through the door as defendant and the other man beat and kicked Hibbs repeatedly, causing such severe bleeding from his nose that Justice could see blood splattering out of Hibbs' head and little spots of blood on defendant's clothing. The two men then dragged Hibbs to the back alley, where defendant continued to kick and beat him. According to Justice, the entire episode lasted approximately one-half hour. Hibbs was later found in a nearby carport, dead from injuries received in the beating.

A second witness for the State, Terry Schroeder, testified that after defendant and Tidwell had taken Hibbs outside, Tidwell returned alone shortly thereafter. Approximately five minutes later, defendant and the other patrons re-entered the tavern. As defendant walked up to the bar, he flexed his muscles, and another man patted him on the

back. Both witnesses particularly noted defendant because he was the only person who did not wear a jacket when the crowd went outside. Both clearly saw his clothing, which consisted of blue jeans and a dark tee shirt with a plant design, but Schroeder did not see any blood on defendant after the first fight.

A short time later, defendant was playing pool with a Mexican man, Orlando Cruz, when a fight between them broke out. Defendant struck and kneed Cruz in the face and hit him over the head with a pool cue, causing severe bleeding. Cruz called the police, but defendant slipped out the back door and went home, where he was awakened shortly thereafter by the police and taken to the police station for questioning. The dark tee shirt and blue jeans were subjected to tests for blood and blood type.

Defendant's version of the incident with Hibbs differed significantly from that of both Justice and Schroeder. His story was corroborated by Schroeder and was not directly contradicted by Justice up to the point at which the victim was taken outside. At that point, defendant testified, Tidwell laid Hibbs down on the grass, but he got up again. Defendant inquired if he wanted a cab; Hibbs said he did not and began walking toward the alley, whereupon defendant went back into the bar. According to defendant, the only fight he had that evening was with Cruz during a game of pool. The only blood found on his clothing matched that of Cruz, not Hibbs.

The only other witness was Dr. Robert Kirchner, deputy medical examiner of Cook County, who testified that Goldie Hibbs' face and head displayed fractures and abrasions consistent with being struck by a fist, while the fatal wound, a laceration of a major artery to the back of the head, had resulted from Hibbs' head striking against concrete or being struck with a heavy object. He testified to heavy bleeding from Hibbs' fractured nose, which was borne out by photographs taken at the scene, and acknowledged that although blood on the assailant's clothing would be consistent with Hibbs' wounds, such an occurrence was purely conjectural, and it was just as likely that an assailant's clothing would show no traces of the victim's blood.

Following closing argument, the trial court orally presented detailed findings of fact, pronounced defendant guilty of murder, and entered its sentence. Thereafter, defendant filed this appeal.

OPINION

I

Defendant's first claim on appeal is that the State failed to prove

him guilty beyond a reasonable doubt. Specifically, defendant maintains that the amount of alcohol drunk by Timothy Justice, the State's chief witness, on the night of Goldie Hibbs' death rendered him an unreliable witness whose credibility was highly overvalued by the trial court. Defendant claims that, instead of providing necessary corroboration of the single eyewitness, all the other evidence in the case tends to negate Justice's story.

While we agree that there are discrepancies between the details as remembered by the various occurrence witnesses, we do not agree that these discrepancies are of such magnitude to cause us to substitute our judgment for that of the trial court. Differences in the estimates of the duration of the fight, in the location of the door outside of which the fight took place, and the sighting of blood on defendant's clothing after the first fight were all conflicts in the evidence for the trier of fact to resolve. *People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 426 N.E.2d 586.

Defendant finds further support for his reasonable doubt argument in Justice's own testimony concerning the number of drinks he had consumed that evening and his possible bias as a witness for the State, as well as in the long hours of conference Justice had had with the assistant State's Attorney. We note that the record discloses that on cross-examination defense counsel consistently attempted to increase the number of drinks Justice admitted to consuming at various bars during the evening of November 13-14, while Justice usually admitted to drinking fewer. Phrases such as "another half dozen drinks" or "six, eight, ten" more drinks often were incorporated into defense counsel's leading questions. Justice repeatedly said he could not remember exactly how many drinks he had had at each bar but consistently maintained that he was not drunk, and the amount of corroborated detail he remembered tends to support his ability to perceive and recall.

Further, the long conferences with the assistant State's Attorney did not reflect a desperate attempt by the State to bolster Justice's memory, but rather resulted from the necessity of reviewing his testimony through a sign language interpreter who was more skilled in translating straight English than she was in Justice's language, American Sign Language (ASL). Finally, although defense counsel questioned Justice at length concerning his possible bias and motive for providing the State with evidence to convict defendant in return for leniency in his own pending case in the same court, he could draw no actual connection, and the trial court found no bias.

Conflicts in evidence are to be resolved by the finder of fact, and a reviewing court will not reverse a conviction unless the evidence is so

improbable as to raise a reasonable doubt of a defendant's guilt. (*People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 426 N.E.2d 586.) Where a case is tried without a jury, the determination of the credibility of the witnesses and the weight to be given their testimony is for the trial judge, and this court will not substitute its judgment for that of the trial court, who saw and heard the witnesses. (*People v. Henson* (1963), 29 Ill. 2d 210, 193 N.E.2d 777.) The positive testimony of one credible witness is sufficient for a conviction even though it is contradicted by the defendant. *People v. Holt* (1962), 25 Ill. 2d 313, 185 N.E.2d 160.

▆▆ In the instant case, the testimony of Schroeder substantially supported that of Justice in that defendant's actions upon returning to the bar were consistent with those of a man who has won a fight. Both men testified to a number of the patrons surging out the door of the bar in the wake of defendant and Tidwell and remaining outside for a significant period of time. Although discrepancies appear, "[i]t is rare, indeed, when all details of any related experience will fit as a perfect whole without minor inconsistencies." (*People v. Neukom* (1959), 16 Ill. 2d 340, 347, 158 N.E.2d 53, 57.) Even though defendant maintains that Justice was too drunk to remember anything accurately, the fact finder's evaluation of the credibility of an individual witness, including one allegedly drunk, was not so unreasonable or improbable as to raise a reasonable doubt of defendant's guilt. See *People v. Neukom* (1959), 16 Ill. 2d 340, 347, 158 N.E.2d 53, 57.

The trial judge's detailed findings of fact amply demonstrate that he carefully weighed all the factors here argued by defendant, including the possible bias of the State's chief witness, and found them insufficient to destroy his conclusion that Justice was a witness worthy of belief. Accordingly, we affirm the trial court's finding that defendant was proved guilty beyond a reasonable doubt.

## II

▆▆ The second issue raised by defendant on appeal is the alleged violation of his sixth amendment right to confront witnesses against him, which allegedly occurred when the trial court permitted the use of two interpreters for a deaf-mute witness. After reviewing the testimony of the witness and the extensive *voir dire* of the two interpreters, we find no error in the dual interpreter system allowed by the trial court.

The basis for defendant's claim of error was the use of a "chain" of interpreters to transmit questions to and answers from Timothy Justice. Both interpreters were officially approved by the court, and each served a different function. The first interpreter, who was not deaf her-

self, knew ASL but was far more proficient in translating spoken English into its direct word-by-word sign language equivalent. Although she had gained most of her experience by translating spoken English into standard word-for-word signs for her deaf parents, she had taken some additional training in ASL and was an official court interpreter. The second interpreter was herself deaf and had had such extensive training in ASL that she also served as a teacher of ASL. Although the first interpreter knew some ASL, she was not nearly as strong in that conceptual language as was the second interpreter. Further, Timothy Justice, the deaf-mute witness, was very strong in ASL but did not know direct word-for-word translation of English into signs at all. Therefore, although the second interpreter was able to communicate easily with Justice, her own deafness made it imperative that some efficient method be found to communicate to her the attorneys' questions and the colloquies between counsel and the court so that she could translate them to Justice.

The first interpreter served that function. She signed to the second interpreter the word-for-word English spoken by the other participants in the trial; the second interpreter converted the words into ASL concepts understandable by Justice, who then signed his responses back to her in ASL, whereupon she verbalized his answers in English.

The problem defendant is here claiming impaired his right to confront the witness arose because Justice's answers were two steps removed from defense counsel's questions. At times, the second interpreter repeated or rephrased a question without first informing the court what Justice's original response had been. When defense counsel objected strongly, she stated that Justice's answer demonstrated that he had not understood the question so she had rephrased it and asked it again. After being admonished by the court to relay his nonresponsive answer without rephrasing the question, she did so. Nevertheless, defense counsel indicated his frustration at not being able to follow the signed questions and answers and claimed that such an "inexact science" had no place in the courtroom.

While we sympathize with defendant's frustration, we note that both civil and criminal codes provide for the use of interpreters for non-English-speaking participants in a trial, be they parties or witnesses. (Ill. Rev. Stat. 1983, ch. 110, par. 8—1402; Ill. Rev. Stat. 1983, ch. 38, par. 165—11; see *People v. Woodall* (1970), 131 Ill. App. 2d 662, 264 N.E.2d 303.) Testimony of a deaf witness may be secured by whatever means are necessary and best adapted to the case, which is a matter within the discretion of the trial court. *Harrison v. Thackaberry* (1911), 248 Ill. 512, 94 N.E. 172.

"[A] witness' inability to speak does not *** violate the defendant's right to cross-examine witnesses so long as [the witness] is able to communicate the facts by other methods and otherwise meets the test of legal competency; *i.e.,* that he can observe, recollect, and appreciate the moral duty to tell the truth." *People v. Spencer* (1983), 119 Ill. App. 3d 971, 979, 457 N.E.2d 473, 479.

Cases from other jurisdictions, cited with approval in *Spencer,* have found no error in allowing testimony of a deaf-mute witness who could communicate through gestures only her brother understood, or a deaf-mute child who was understood only by her teacher because of her youth and inexperience with standard sign language. Therefore, although in the present case the court's dual interpreter solution to the problem of communicating with a witness was unique, it was neither an abuse of discretion nor a violation of defendant's right to confront witnesses against him.

### III

■ Finally, defendant claims that the State's detailed questioning of various witnesses concerning the second fight was highly prejudicial and deprived him of a fair trial. We note that both attorneys mentioned the second fight in their opening statements, and defendant did not object when either Justice or Schroeder began to describe that fight. Defendant himself testified to his conviction for aggravated battery for the fight over the pool game, and even during his cross-examination, his counsel made no objection to any questions concerning the second fight until the subject of blood on the pool cue was introduced. Because the issue of blood on defendant's clothing was a material issue, the judge overruled the objection, and the questioning about the second fight continued without further objection. Under these circumstances, we find that defendant has waived the issue for purposes of review. *People v. Fain* (1976), 41 Ill. App. 3d 872, 355 N.E.2d 61.

In light of the foregoing analysis, we find no error on the part of the trial court and accordingly affirm defendant's conviction of murder.

Affirmed.

JOHNSON and ROMITI, JJ., concur.