2022 IL App (1st) 210432-U
No. 1-21-0432

FIRST DIVISION
December 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 CR 5998 |
| | ) | |
| ERNEST MITCHELL, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Lavin concurred in the judgment.

**ORDER**

¶ 1 *Held:* Defendant's armed robbery conviction and sentence affirmed over defendant's challenge to the sufficiency of the evidence relating to his conviction and to his contention that trial counsel provided ineffective assistance of counsel for failing to move to continue the sentencing hearing for an additional three months to seek the application of a change in the sentencing law, not yet in effect, which would have provided for a lesser term of mandatory supervised release.

¶ 2 Following a bench trial before the Honorable James B. Linn, defendant, Ernest Mitchell, was convicted of armed robbery. He was sentenced to six years' imprisonment and three years' mandatory supervised release. On appeal, defendant asserts: (1) his armed robbery conviction

should be reversed where the testimony of Larry Jones was unreliable and the remaining evidence failed to prove his guilt beyond a reasonable doubt; and (2) his trial counsel provided ineffective assistance by failing to move to continue his sentencing hearing for an additional three months in order to seek the application of a change in the sentencing law which would have allowed for less time spent on mandatory supervised release. For the following reasons, we affirm defendant's conviction and sentence for armed robbery.

¶ 3                                                                    BACKGROUND

¶ 4       The instant case arose from events that occurred in the late afternoon and evening of July 17, 2017, behind a business located in the strip mall at 1237 South Clinton Street, in Chicago, Illinois. Defendant was charged with multiple counts of first degree murder and one count of armed robbery for the beating death of Curtis Sanderbeck (Sanderbeck) who died of his injuries on August 14, 2017. Bernard Bashum (Bashum) and Larry Jones (Jones) were also charged, in a separate indictment, to multiple counts of first degree murder and armed robbery related to this same offense. Defendant, before he was indicted in this case, testified against Bashum at his jury trial pursuant to a court order of use immunity, meaning his testimony could not later be used against him. 725 ILCS 5/106-2.5(b). Jones entered into a plea agreement, agreed to testify for the State, and testified at Bashum's jury trial. Bashum was found guilty of first degree murder and sentenced to 22 years' imprisonment.[1]  At his subsequent bench trial before the Honorable James B. Linn, defendant was found not guilty of first degree murder and guilty of armed robbery. Defendant was sentenced to 6 years' imprisonment and three years' mandatory supervised release for armed robbery.

_____

[1] On August 29, 2022, Bashum's challenge of his conviction was remanded for the purpose of holding a preliminary *Krankel* inquiry into Bashum's claim of ineffective assistance of trial counsel. *People v. Bernard Bashum*, 2022 IL App (1st) 1200168-U.

¶ 5 **Live Testimony presented at Defendant's bench trial**

¶ 6 At the bench trial, the State presented the live testimony of Jones and Johann Kirschinger (Kirschinger). The parties also stipulated to some of the evidence presented during Bashum's jury trial, with specific redactions.

¶ 7 At defendant's bench trial, Jones testified that he previously pled guilty to robbery as part of a plea agreement and anticipated being sentenced to 20 years' involvement for his involvement in this case. One of the terms of his plea agreement was that he testify in Bashum's trial. He also admitted that he had prior convictions for forgery, burglary, theft, and retail theft. He testified that in the summer of 2017, he was staying at Pacific Garden Mission, a homeless shelter. He knew Sanderbeck from the shelter, but only knew him by his first name and referred to him as "Kurt." He testified that Sanderbeck was a mechanic, and they would hang out together and drink. Jones made an in-court identification of defendant and knew him by the nickname "Country." He also hung out with "Diamond" and Bashum, whose nickname was "Moe" or "Little Moe."[2]

¶ 8 A strip mall was located close to this homeless shelter. During the day, Jones and Diamond would make money by assisting customers with loading their merchandise from the nearby Home Depot and Jewel as well as other stores located in that strip mall. Jones, Diamond, Bashum, and defendant would also hang out together in front of the Home Depot and Jewel stores.

¶ 9 During the evening of July 16, 2017, Jones slept at the shelter and left there at 6:45 a.m. He stopped at Jewel, waiting for the liquor department to open at 7:00 a.m. Diamond and Sanderbeck were with him at this time. A short time later, defendant and Bashum joined them. Jones went into the store, bought liquor and beer, and began to drink with Sanderbeck. When the four of them

---

[2] "Diamond" was subsequently identified as Tyrone Willis by Chicago Police Officer Mark Cobarrubias.

walked towards Home Depot, Jones heard Sanderbeck say that "I hope them n*****s not messing with my tools when I get back to work." Jones had previously heard Sanderbeck use that word towards people at the shelter.

¶ 10    Before Jones went to work later that morning, he hung out with Sanderbeck, and they drank the purchased liquor and beer. During that time period, Jones heard Bashum, and defendant say that "they was [sic] going to jump on [Sanderbeck]." Jones told them "[n]ot to mess with him. You all not going to put any hand on him." Jones and Sanderbeck left, with Jones going to work and Sanderbeck sitting on the steps across the street from Home Depot. Sanderbeck drank, dozed off, and slept on a cardboard box. Jones checked on him to see if he was all right and to make sure that nobody "mess[ed] with him."

¶ 11    Jones also testified that, before he went to work, he heard Sanderbeck talking about money, and going to get money from his boss. Jones testified that Sanderbeck made these statements while Jones was sitting across the street from Home Depot with defendant, Bashum, and Diamond. Jones stated that Sanderbeck showed him some money.

¶ 12    Ten hours later, Jones and Sanderbeck rejoined defendant, Bashum, and Diamond. Jones testified that they "came back with - - still with that grudge" and said that they were "going to do something to [Sanderbeck]." At this time, Sanderbeck was still intoxicated and was still lying on the cardboard box across the street from Home Depot. Defendant was pushing a shopping cart and Bashum had a big, long stick of pine wood. Jones approached Bashum and asked him what he was going to do with that stick. Bashum said that "he was gonna jump on him and stuff." Jones told him "[n]o, you're not gonna come around here and put your hands on him. You're not gonna jump on him."

¶ 13     When it appeared that Sanderbeck heard what they said, he got up and was attempting to walk away but Bashum grabbed him by his collar. Bashum slipped and "busted his elbow" and Sanderbeck got away from him. Then, defendant called Sanderbeck to come behind a wall, saying that he needed to talk to him. When Sanderbeck got behind the wall, Bashum grabbed him by the waist and threw him against the concrete wall, causing Sanderbeck to fall to the ground. Jones testified that the one side of Sanderbeck's body hit the wall and "knocked a whole lot of wind up out of him, too." Jones did not see that Sanderbeck had a weapon or threw any punches. Jones opined that Sanderbeck could not fight back because he was intoxicated.

¶ 14     When Sanderbeck fell to the ground, Bashum "ran and started stomping [Sanderbeck's] head into the concrete," using all his weight to stomp him three or four times. Jones noticed blood coming out of Sanderbeck's eyes and ears. Jones attempted to pull Bashum away, but Bashum jerked away from him and used the long pine stick to beat Sanderbeck in the face. Jones pulled Basham away and told him to quit. At this point, defendant was standing there and did not try to assist Jones. Bashum stopped beating Sanderbeck when a security guard from the nearby Jewel store pulled up. Afterwards, Bashum took the stick that he used to beat Sanderbeck and threw it in the dumpster. Bashum also removed his shoes and threw them in the dumpster. Jones admitted that he took $40 from Sanderbeck and gave $20 to defendant and $20 to Bashum. Jones stated that Diamond was not in the area when the beating occurred but was working in the parking lot of Home Depot.

¶ 15     Jones exited the area, sat down on some nearby steps, and asked the security guard to call the police. He spoke with some detectives at the scene and told them that just Sanderbeck, Bashum and himself were in the area and that he was trying to help Sanderbeck by trying to pull Bashum off him. He saw the police handcuff Bashum and put him into a police car. Jones was arrested

when he and Diamond, who was pushing a bicycle, were walking to Walgreens to purchase some more alcohol. At that time, Jones had Sanderbeck's cellular telephone and $20 belonging to Sanderbeck. He explained that he had gotten Sanderbeck's phone earlier that morning.

¶ 16     On cross-examination, Jones testified that he spoke to the police right after the incident and again in November of 2017. During the initial conversation, he did not tell the police that he had taken money from Sanderbeck and did not mention defendant's involvement. In November of 2017, he told the police that some money fell out of Sanderbeck's pocket after he was beaten, but then admitted that he went through Sanderbeck's pockets and took $40. During that conversation, the police asked him if he remembered a man with a shopping cart. At that time, he told the police that he only knew that man from the shelter and did not know his name but identified this man as the person who pushed Sanderbeck against the wall. He admitted that, at different times, he told the police that it was Bashum's idea to take the money from Sanderbeck, and at other times, he said it was defendant's idea.

¶ 17     Johann Kirschinger (Kirschinger) testified that he and his young daughter went to Home Depot in the late afternoon of July 17, 2017. He exited the front door on the north side of the store on his way to his car, which was parked along the street. Kirschinger noticed four black males talking to a "dark-toned brown Hispanic male" in the middle of the street. From a distance of four to five feet away, he could see that "they were trying to pair up some of the black males to go fight the Hispanic male." He described two of the black males as being average height and weight, one black male as being shorter with a lean and very defined muscular frame, and one black male as being six foot six inches tall and weighing between 250 to 300 pounds. The larger man, who was wearing a green/beige baseball hat, was "trying to pair up one of the other three guys to fight***"[H]e pointed to him and he pointed to him, they both nod and then they kind of, like

square off." One of the black males approached the Hispanic male, and the Hispanic male backed away, saying "no, no, no."

¶ 18    Kirschinger and his daughter remained inside his car, watching this unfold. Kirschinger then saw the larger black male use a hand gesture to direct this group of people to an area across the street where there was a cinderblock wall. He described this area as a place where the trash was kept, and the garbage trucks would drive through to collect the trash. When the Hispanic male walked past him, he looked at Kirschinger and said something to him in Spanish, but Kirschinger did not understand. He saw the group of people go behind the cinderblock wall. As he slowly drove forward, he saw a piece of wood flying up into the air as he "thought something got broke – broke from force and that piece was flying up into the air."

¶ 19    He parked, gave his daughter his cellular telephone, and told her to call 911. He walked back behind the cinderblock wall and saw the Hispanic male lying on the ground and the four black men and one black female exit the area. This was the first time that he saw the female. He went back to his car and spoke with the 911 operator. He stayed at the scene to speak with the police. While he was talking to the police, he could see the entrance to Home Depot and saw the larger black male and at least two other people sitting by the front door to the store. He subsequently viewed a photo array but was unable to make an identification of anyone. The parties stipulated that the photo array shown to Kirschinger contained a photo of defendant.

¶ 20    **Stipulated testimony from Bernard Bashum's jury trial**

¶ 21    The parties stipulated to the some of the evidence presented at Bernard Bashum's trial, including testimony regarding in-court identifications and exhibit foundations and publication, but with specific questions and answers redacted.

¶ 22      Michael Watson (Watson), a security guard working at the Jewel-Osco store at 1340 South Canal Street, had known Sanderbeck for approximately one year. Watson spoke with him on a regular basis. On July 17, 2017, Watson was working 6:00 a.m. to 2:00 p.m. At approximately 9:45 a.m., Sanderbeck walked past Watson and told him that he was about to make a phone call and go to a check-cashing store because someone was going to wire him some money. He then saw Sanderbeck walk towards the check-cashing store. Approximately 15 minutes later, he saw Sanderbeck stop to join a group of men. Watson recognized Larry Jones, Diamond, defendant, and Bernard Bashum and knew that these men stayed at the nearby shelter. These five men hung out together and were drinking.

¶ 23      Then, this group of men sent Bashum into the Jewel because the other men were barred from the store. He saw Sanderbeck pull out a "wad of money" and give some money to Bashum before he went into the store. Watson could not tell how much money Sanderbeck had but estimated that it was around $500.00. Sanderbeck then put the money back into his pocket. He testified that Bashum was there when Sanderbeck put the money back into his pocket. He did not hear of a robbery plan.

¶ 24      Adam Ortiz (Ortiz) also worked as a security guard at this strip mall and July 17, 2017, was the first day at this assignment. He started working at 3:00 p.m. When he was patrolling the area with a training officer, who took him to "the back area" and introduced him to some of the homeless men who hung out in the area. He recalled meeting Bashum, Jones, and Sanderbeck.

¶ 25      At approximately 5:00 p.m., he received a communication from his supervisor. Ortiz noticed that there were a couple homeless men in a restricted area behind the businesses, and he was instructed to move them away from that area. Ortiz met with his supervisor at that area. When they arrived, he saw Sanderbeck lying down behind the wall, face up. Ortiz thought that Sanderbeck

might just be sleeping and attempted to wake him up. When Sanderbeck did not move, Ortiz noticed that there was a lot a blood on Sanderbeck's face, there was cut running across the middle of his bottom lip, his nose had been beaten, but he was still breathing.

¶ 26    After the paramedics arrived and Sanderbeck was placed on a stretcher, Ortiz continued to patrol the area. He saw Bashum and Jones across the street by Home Depot. Upon approaching them, Ortiz saw two spots that he suspected to be blood stains on the left side of Jones' sweater. He subsequently identified Bashum from a photo array.

¶ 27    Chicago Police Officer Juan Avelar and his partner, Officer Wilson, testified that he responded to the scene for a battery in progress. After speaking with a security guard who provided them with a description, they toured the area. After not being able to locate any of the offenders, the officers went back to the scene and saw that the paramedics had arrived to treat the victim. The officers went to the hospital to see that the victim was receiving treatment.

¶ 28    Officer Avelar went back to the scene at 6:45 p.m. after receiving a police dispatch with an updated description of possible offenders. By the Home Depot store, Officer Avelar observed individuals who fit that description who were standing on the other side of the wall where Sanderbeck was injured. Officers Avelar and Wilson detained Bashum and placed him in the back of his squad car. The parties stipulated that Officer Michael Wilson would testify that when he detained Bashum, he recovered a pair of socks with suspect bloodstains on them and subsequently inventoried the socks.

¶ 29    Officer Avelar then spoke with defendant, who as standing nearby with a shopping cart, wearing a green hat. Defendant told him that Bashum beat Sanderbeck and that Jones robbed him. As no one had identified defendant as having been involved, Officer Avelar only considered Mitchell to be a witness and did not search him or his belongings. The officer also learned that

Jones was detained shortly thereafter in a nearby area. The State introduced into evidence the video footage of Officer Avelar's body-worn camera during this investigation.

¶ 30      Chicago Police Officer Mark Cobarrubias testified that he responded to the area around Home Depot at 7:00 p.m. and spoke with another police officer. Based upon that conversation, he went to the corner of Roosevelt and Clinton Streets and saw two males. He stopped Jones and Tyrone Willis, who had a bicycle. He performed a pat down search of both men. After some other officers arrived, and he learned that an identification had been made, Jones was placed under arrest. During a custodial search, he found a cellular telephone and a wallet. The State introduced into evidence the video footage of Officer Cobarrubias' body-worn camera from this encounter.

¶ 31      Chicago Police Detective Anthony Winburn testified that he arrived at the scene, along with his partner, Detective John Sego. Detective Winburn walked through the crime scene and saw red droplets of suspected blood, a vodka bottle, two pieces of wood that looked like it had been broken, and strands of hair. He estimated that the wood was approximately 30 to 35 inches long when put back together. This evidence was collected by Jose Alvarez (Alvarez), an evidence technician. The parties stipulated that Alvarez would testify that the victim's body had already been removed when he arrived at the scene. He collected and inventoried a green camouflage baseball hat, apparent hair from the ground next to the green hat, two pieces of wood with suspect red bloodstain, and a vodka bottle.

¶ 32      On subsequent dates, Detectives Winburn and Sego attempted to locate defendant but were unable to locate him until July 19th. At that time, defendant appeared to have been drinking, and Detective Winburn chose to wait and speak with him when defendant was sober.

¶ 33    Chicago Police Detective Ruben Sanchez testified that he became involved in this investigation upon Sanderbeck's death on August 14, 2017.[3] He spoke with defendant in October of 2017 and during that interview defendant was treated as a witness as he did not have any information that defendant was involved in this offense. Detective Sanchez also spoke with Johann Kirschinger, who described the people present that day, but was unable to identify anyone. He learned that Bashum and Jones had previously been released from custody, but on November 6, 2017, Jones back in custody. During his testimony, he reviewed and provided descriptions of the surveillance video taken from the front entrance to Home Depot. The State published clips of that videotape, and Detective Sanchez identified Bashum, Jones, defendant, and Diamond as persons near that store when the first emergency vehicle arrived on the scene. The videotape showed Jones and Diamond speaking with each other at the entrance to Home Depot, and defendant then joined them. Detective Sanchez testified that the videotape showed Jones "reenacting the beating." The video then showed Jones walking north "and he's taking a look at what's going on with the victim." Then, the videotape showed Diamond, Jones, and Mitchell walking in different directions at various times. The videotape showed, a few minutes later, Jones going into the picnic area to the left of the main entrance, followed by defendant and Diamond. Bashum joined the group approximately ten minutes later. The videotape did not capture the actual beating of Sanderbeck and did not show Bashum carrying a stick.

¶ 34    The parties stipulated that Sanderbeck was transported to Stroger Hospital. He suffered two lacerations and abrasions to the back of his head, his top lip was split in half, a fractured jaw, and an acute subdural hematoma of the left cerebral hemisphere. Sanderbeck had a blood alcohol

---

[3] Portions of Detective Sanchez's trial testimony from Bernard Bashum's trial were redacted upon agreement of the parties.

content of .295 shortly after entry into the hospital. He was treated at Stroger Hospital until August 4, 2017, at which time he was transported to another treatment center and died on August 14, 2017. Doctor Lauren Woertz performed his autopsy. Doctor Woertz noted the presence of the subdural hemorrhage overlying the left hemisphere of the brain, a small hematoma on the inner aspect of the scalp, and a fractured jaw. She also noted some nonlethal injuries including some abrasions on his chest and left hand. She did not notice any facial lacerations, broken bones, or other injuries to his midsection, but these types of injuries could have healed within a month of occurring. She testified that the injuries were consistent with somebody who was stomped or kicked, but she could not tell what instrument was used to hit him. She determined that the cause of death was complications of blunt head trauma due to an assault, and the manner of his delayed death was homicide.

¶ 35    The parties stipulated that the Illinois State Police Crime Lab received buccal swab standards from Bashum and Sanderbeck. Veronica Johnson, a forensic scientist and an expert in the field of forensic biology, received a gray sweatshirt recovered from Jones. A stain on the sweatshirt was examined and found to indicate blood. She also tested a red t-shirt, jogging pants, and a pair of socks recovered from Bashum. She did not observe any blood-like stains on the shirt but found that a stain on the jogging pants and on the socks indicated blood. She also examined the stains on each of the two pieces of wood and found them to indicate blood. A swab for these stains were preserved for DNA analysis.

¶ 36    Megan Neff, a forensic scientist and expert in the field of DNA analysis, conducted DNA analysis on the known buccal standards collected from Sanderbeck, Bashum, and Jones, and she was able to identify a profile from each of the standards which was suitable for comparison. From the bloodstain on Jones' gray sweatshirt, there was a mixture of human DNA profile and Bashum

was included in the major human male DNA profile, and the minor profile not suitable for comparison. Sanderbeck and Jones were excluded from the major profile of the sweatshirt. She identified the blood found on Bashum's pants and the pieces of wood as highly likely belonging to Sanderbeck, occurring in approximately one in 160 nonillion unrelated individuals. Jones and Bashum were excluded from this profile. As far as the bloodstain on Bashum's socks, there was a mixture of human DNA profiles and Sanderbeck was identified as a major human male DNA profile and a minor contributor consistent with Bashum's DNA expected to occur in one out of every 130 unrelated persons.

¶ 37    On September 16, 2020, the trial court found defendant guilty of armed robbery and not guilty of first degree murder. The trial court made the following findings:

> I am finding, factually, that [defendant] was part of a group that were trying to roll Mr. Sanderbeck and take advantage of his money and did, indeed, take his money; that he's accountable, in part, for the acts of Bernard Bashum as part of this armed robbery because the stick was a dangerous weapon and it's borne out by what happened with that stick and the fact that it killed him.
>
> I cannot say that there's any fair reason to believe that [defendant] had, in his heart, something like homicide or murder. ***I think [defendant] was trying to get some money from a person that was vulnerable and I, accordingly, don't find the interest of justice, I don't think he was acting in concert with Mr. Bashum so far as the intent to kill somebody or knowing – strong probability that death or great bodily harm would come from using the stick to perfect the robbery, so I'm gong to give [defendant] the benefit of the doubt as to [the first degree murder counts]. However, I do find him guilty as to Count 7, armed robbery on the theory of

accountability. He shared proceeds and he was part of the group and took an active

part in getting Mr. Sanderbeck to the location where he was attacked and organizing

and sharing the proceeds of the robbery.

¶ 38   On April 8, 2021, the trial court sentenced defendant to 6 years' imprisonment and three years'

mandatory supervised release for armed robbery.

¶ 39                                    ANALYSIS

¶ 40                    **I. Sufficiency of the Evidence for Armed Robbery**

¶ 41   Defendant challenges the sufficiency of the evidence presented for his conviction for armed

robbery. Specifically, defendant contends Larry Jones was an unreliable witness and the remaining

evidence failed to prove that defendant shared the requisite criminal intent or a common criminal

design for committing the offense of armed robbery. In turn, the State argues that the evidence at

trial conclusively established defendant's accountability for this offense beyond a reasonable

doubt.

¶ 42   The due process clause of the fourteenth amendment safeguards a criminal defendant from

conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to

constitute the crime charged. *People v. Brown*, 2013 IL 114196, ¶ 48; *Jackson v. Virginia*, 443

U.S. 307, 315-16 (1979). When considering a challenge to the sufficiency of the evidence in a

criminal case, a reviewing court's function is not to retry the defendant. *People v. Lloyd*, 2013 IL

113510, ¶ 42. Rather, a reviewing court must decide whether, after viewing the evidence in the

light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the offense beyond a reasonable doubt. *Id*.

¶ 43   This means that we must draw all reasonable inferences from the record in favor of the

prosecution, and that "'[w]e will not reverse a conviction unless the evidence is so improbable,

unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.'" *Lloyd*, 2013 IL 113510, ¶ 42 (quoting *People v. Collins*, 214 Ill.2d 206, 217 (2005)). In reviewing a trial court's decision, we must give proper deference to the trier of fact who observed the witnesses testify, because it was in the "superior position to assess the credibility of witnesses, resolve inconsistencies, determine the weight to assign the testimony, and draw reasonable inferences therefrom." *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 24. Circumstantial evidence is sufficient to sustain a conviction as long as it satisfies proof beyond a reasonable doubt of the charged offense. *People v. Hall*, 194 Ill.2d 305, 330 (2000).

¶ 44 A person commits armed robbery by "knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force," and he "carries on or about his or her person or is otherwise armed with a dangerous weapon other than a firearm." 720 ILCS 5/18-1(a) (West 2017); 720 ILCS 5/18-2(a)(1) (West 2017). That State proceeded to trial under a theory of accountability. A person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010). The prosecution must also establish that the defendant's participation was accompanied by a concurrent, specific intent to promote or facilitate the commission of the offense, or there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 21; *People v. Perez*, 189 Ill.2d 254, 260 (2000).

¶ 45 To prove that a defendant had the intent to promote or facilitate a crime, the State must establish beyond a reasonable doubt that either: (1) he shared the criminal intent of the principal offender; or (2) there was a common criminal design. *Perez*, 189 Ill.2d at 266 (2000). "Accountability may

be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly *participated* in the criminal act itself." *Id*. at 267. Under the "common design rule," where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. *Id*. at 267. Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Fernandez*, 2014 IL 115527, ¶ 13; *People v. J.H.*, 136 Ill.2d 1, 17 (1990).

¶ 46    Proof of the common purpose or design need not to be supported by words or agreement but may be drawn from the circumstances surrounding the commission of the unlawful conduct. *People v. Reid*, 136 Ill.2d 27, 62 (1990). A conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group. *People v. Cooper*, 194 Ill.2d 419, 434-35 (2000). Moreover, a defendant may be found to have aided and abetted without actively participating in the overt act itself. *People v. Stanciel*, 153 Ill.2d 218, 237 (1992). In determining whether a defendant is accountable, the trier of fact may consider: (1) the defendant's presence during the planning of the crime; (2) his presence during the commission of the crime; (3) his flight from the scene; and (4) his continued association with the principal after the commission of the crime. *Perez*, 189 Ill.2d at 267.

¶ 47    After viewing the evidence under the light most favorable to the prosecution, we find a rational trier of fact would have found that defendant was accountable for the armed robbery under a theory of common criminal design. Defendant stipulated to testimony presented at Bashum's trial which showed that prior to the armed robbery, Michael Watson, one of the security guards, saw

Sanderbeck pull out "a wad of money," estimated to be $500.00 or more, and hand some of the money to Bashum to Jewel to purchase beer and other alcohol. Defendant, Jones, and Bashum were present during this exchange. Jones testified that he heard Sanderbeck say, in defendant's presence, that he was going to get money from his boss that morning. Jones further testified that defendant was present when Bashum threatened to "jump on" Sanderbeck.

¶ 48    Both Jones and Kirschinger testified that defendant lured Sanderbeck to the area behind the concrete wall right before Sanderbeck was beaten. Jones testified that defendant called Sanderbeck to come behind a wall, saying that he needed to talk to him. Likewise, Kirschinger testified that a person, who fit the description of defendant, used a hand gesture to direct the group of men, including Sanderbeck, to the area behind the concrete wall. Jones testified that defendant was present when the beating occurred. He also admitted that he gave defendant $20.00 of the $40.00 that he stole from Sanderbeck after the beating. There was also testimony, as well as videotape evidence, showing that defendant continued to associate with Bashum and Jones afterwards.

¶ 49    Defendant's attack on the sufficiency of the evidence is largely based upon his assertion that Jones was an unreliable witness based upon his criminal history, he had been drinking that day, his accounts were inconsistent, and his trial testimony "enjoyed little corroboration." However, it is well-established that a reviewing court is not permitted to substitute its judgment for that of the trier of fact on issues that involve the credibility of the witnesses and the weight of the evidence and thus "gives great deference to the findings of the trial court regarding the credibility of witnesses." *People v. Jones*, 2019 IL App (1st) 170478, ¶¶ 24, 29 (citing *People v. Little*, 2018 IL App (1st) 151954, ¶ 36. From the trial court's findings, it is evident that the trial court, as the trier of fact, found that Jones was a reliable witness in finding defendant guilty of armed robbery.

¶ 50    As far as defendant's reliance upon evidence that Jones had been drinking that day, we recognize that this type of evidence if probative of the witness's sensory capacity and affects the weight to be given her testimony. *People v. Gray*, 2017 IL 120958, ¶ 40 (citing *People v. Di Maso*, 100 Ill.App.3d 338, 343 (1st Dist. 1981) and *People v. McGuire*, 18 Ill.2d 257, 259 (1960)). However, the fact that a witness may have been drinking alcohol or was drunk does not necessarily preclude the trier of fact from finding the witness credible. *People v. Bradford*, 194 Ill.App.3d 1043, 1046-47 (1st Dist. 1990); *People v. Vandiver*, 127 Ill.App.3d 63, 67 (1st Dist. 1984). Here, the trial court was aware that Jones admitted to consuming alcohol that morning, but there is no evidence as to the how much he consumed, and the beating occurred approximately ten hours later.

¶ 51    We do not agree with defendant's suggestion that Jones' testimony "enjoyed little corroboration." We look at the trial testimony of Kirschinger, as well as the videotape evidence, which corroborates Jones' testimony as to defendant's presence at the time of the incident, defendant's act of luring Sanderbeck and the other participants to the secluded area behind the concrete wall, and defendant's continued association with the other participants afterwards. We also recognize that identification of the accused by a single eyewitness is sufficient to sustain a conviction. *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 36 (citing *People v. Johnson*, 114 Ill.2d 170, 189 (1986)). Notably, defendant points out that when he spoke with Officer Avelar, he identified Bashum as beating Sanderbeck and Jones as taking Sanderbeck's money. However, this evidence does not provide a reasonable doubt but actually corroborated Jones' trial testimony.

¶ 52    Viewing the evidence in the light most favorable to the State and deferring to the trial court's credibility determinations, we hold the evidence reasonably supports a finding of guilt beyond a reasonable doubt for the offense of armed robbery. Based on the above evidence, a rational trier of fact could have found the State proved defendant's guilt beyond a reasonable doubt.

¶ 53 **II. Ineffective Assistance of Trial Counsel**

¶ 54    Defendant contends that his trial counsel was ineffective for failing to move to continue his sentencing hearing for an additional three-months so that he could be sentenced to a lesser term of MSR until an already-enacted law went into effect. Specifically, he asserts that he could have elected to be sentenced under the new MSR provision, which lessened the term from three years to 18 months if his trial counsel would have sought to continue the sentencing hearing until after its effective date. In turn, the State contends that defendant cannot establish that his trial counsel provided ineffective assistance under either prong of *Strickland* analysis.

¶ 55    The offense in this case occurred on July 17, 2017. Defendant was subsequently indicted and was found guilty of armed robbery on September 16, 2020. The trial court and the parties could not proceed to a sentencing hearing on October 14, 2020, and again on December 15, 2020, because the pre-sentence investigation report was unavailable. Defense counsel filed his post-trial motion for a new trial on December 15, 2020. On the next date, February 11, 2021, defense counsel stated that he had not been able to visit with defendant in prison because of a quarantine and requested a continuance for the sentencing hearing. The trial court continued the sentencing hearing until April 8, 2021.

¶ 56    In 2017, when defendant committed this crime, and in April of 2021, when defendant was sentenced, the sentencing statute required a defendant convicted of a Class X felony, such as armed robbery, to complete a three-year term of mandatory supervised release (MSR). 730 ILCS 5/5-8-1(d)(1) (West 2017). Pursuant to Public Act 101-0652, approved on February 22, 2021, this sentencing provision was amended to require a Class X offender to complete an 18-month term of MSR. 730 ILCS 5/5-8-1(1.5)(g) (West 2021).  The effective date of this amendment was July 1,

2021, and it applied to "all individuals convicted on or after the effective date." 730 ILCS 5/5-8-1(g) (West 2021).

¶ 57 "A defendant is 'entitled to be sentenced under either the law in effect at the time of the offense or the law in effect at the time of sentencing.'" *People v. Calhoun*, 377 Ill.App.3d 662, 664 (1st Dist. 2007) (quoting *People v. Hollins*, 51 Ill.2d 68, 71 (1972)). "A defendant's due process rights are violated if he is not advised of his right to elect the statute under which he should be sentenced and he does not expressly waive that right." *Id*. "'[Where] any punishment is mitigated by the provisions of a new law, defendant cannot consent to the application of the new provision if it became effective prior to his sentencing.'" *Id*. (quoting *People v. Land*, 178 Ill.App.3d 251, 260 (1st Dist. 1988). "Whether defendant was denied his right to elect involves the application of law to uncontested facts and is reviewed *de novo*." *People v. Viahon*, 2012 IL App (4th) 110229, ¶ 16 (citing *People v. Sims*, 192 Ill.2d 592, 615 (2000)).

¶ 58 Defendant asks us to review his sentencing claim under the lens that his trial counsel was ineffective. Pursuant to the *Strickland* standard, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Specifically, the defendant must prove that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 36. Moreover, "[T]he effectiveness of *** counsel must be assessed against an objective standard of reasonableness from the perspective of the time of the alleged error and without hindsight." *People v. Reed*, 2014 IL App (1st) 122610, ¶ 66.

¶ 59    We recognize that, during the pendency of this appeal and after defendant's opening brief was filed, Illinois courts have addressed similar claims in which the defendants have raised a claim of ineffective assistance of trial counsel relating to amended sentencing statutes. See *People v. Brown*, 2022 IL App (1st) 190812-U; *People v. Broadway*, 2022 IL App (4th) 210417-U; *People v. Foster*, 2022 IL App (3d) 210342-U. In these cases, our colleagues have addressed these claims in unpublished decisions, which provide persuasive authority for our review. See Ill. S. Ct. Rule 23(e)(1) (eff. Jan. 1, 2021) (stating nonprecedential orders under Rule 23(b) may be cited for persuasive purposes).

¶ 60    In particular, the defendant in *Brown* argued that his trial counsel was ineffective for failing to seek a continuance so that the defendant could take advantage of new legislation, the Parole-Appeal and Review Act (Pub. Act 100-1182, § (eff. June 1, 2019), which had yet to take effect. *Brown*, 2022 IL App (1st) 190812-U, ¶ 51. That act implemented parole review after ten years of incarceration for individuals who were under 21 years of age at the time of their offense. 730 ILCS 5/5-4.5-115(b) (West 2020). In *Brown*, the defendant was sentenced almost two months before the Act was to take effect, but three days after the governor signed the legislation. *Id.*

¶ 61    The defense counsel in *Brown* explicitly asked the trial court to consider the new act at the sentencing hearing but did not specify how the court could do so. The First District found that, even if defense counsel's request for the trial court to consider the new act amounted to a request for a continuance, as the defendant argued on appeal, the defendant could not show a reasonable likelihood existed that the court would have granted such a motion. *Id*. at ¶ 53. In finding that the defendant could not establish the prejudice prong of *Strickland*, the court looked at the relevant factors to consider when granting or denying a motion for a continuance, including the history of the case, the complexity of the matter, docket management and inconvenience to the parties and

witnesses. *Id*. (citing *People v. Walker*, 232 Ill.2d 113 (2009). The court considered the defendant's argument that only 37 days had passed between the verdict and the sentencing hearing, but also that the offense had occurred over five years earlier. In conclusion, the court found that the defendant "had not shown a reasonable likelihood exists that the court would have granted a continuance of almost two months for defendant to take advantage of legislation that the legislature had not otherwise endeavored to make applicable to defendant." *Id*.

¶ 62   Subsequently, in *People v. Broadway*, 2022 IL App (4th) 210417-U, the defendant raised a claim of plain error and, alternatively, ineffective assistance of counsel for failing to request that he be sentenced under the new statute which amended the MSR term for a Class 2 felony from 2 years to one year. In this case, the defendant was sentenced on March 1, 2021. The defendant, however, argued that the amended sentencing statute was applicable because he had a pending motion to reconsider his sentence at the time that the new sentencing scheme went into effect on July 1, 2021. *Broadway*, 2022 IL App (4th) 210417-U. ¶ 3. In resolving the plain error claim, the reviewing court concluded that there was no plain error where trial court did not err when it sentenced the defendant to a two-year term of MSR, which was the sentence in effect at the time of sentencing. *Id*. ¶ 72 (citing *People v. Calhoun*, 377 Ill.App.3d 662, 664 (1st Dist. 2007). Moreover, the court recognized that, "where a punishment is mitigated by a new law, [the] defendant can consent to the application of the new, provision if the law becomes effective prior to his sentencing." *Id*. (citing *Calhoun*, 377 Ill.App.3d at 664). However, because the amended statute was not yet in effect when the trial court sentenced the defendant, the court found that the defendant failed to demonstrate a clear and obvious error. *Id*.

¶ 63   Notably, the court also addressed and rejected the defendant's claim of ineffective assistance of trial counsel for failing to request that he be sentenced under the new MSR term or by preserving

the claim in a motion to reconsider. The court found that defendant could not establish that he was prejudiced "because he was not entitled to be sentenced under the 12-month MSR provision where the amended statute was not yet in effect when the trial court sentenced [him] on March 1, 2021…" *Id*. ¶ 75.

¶ 64　　　　More recently, in *People v. Foster*, 2022 IL App (3d) 210342-U, the defendant also argued that his trial counsel was ineffective for failing to file a motion to reconsider. Specifically, the defendant argued that his trial counsel was ineffective for failing to ask the trial court to reconsider his sentence where the sentencing law was changed so that the defendant would not have been subject to Class X sentencing. Initially, the court found that defendant could not establish the deficiency element because the amended statute did not apply to defendant where he pleaded guilty and was sentenced when the previous statute was still in effect. *Id. ¶* 13. The court also rejected the defendant's argument that he was prejudiced, finding that the defendant was not entitled to have the new sentencing statute apply to his sentence before its effective date, which occurred three years after the defendant's judgment was pronounced. *Id*. ¶ 16. The court also found that the defendant did not establish that he was prejudiced where "there is nothing in the record to indicate that the court would have been inclined to reduce defendant's sentence unless it was required to do so." *Id*. ¶ 17.

¶ 65　　　　From this line of cases, we find that defendant cannot establish that his trial counsel was ineffective for failing to file a motion for a continuance. The amended sentencing provision clearly went into effect on July 1, 2021, and thus was not in effect on the date that defendant was sentenced on April 8, 2021. Defendant does not suggest, and we do not find, that this statute had any retroactive application. However, defendant suggests that his trial counsel could have assured that he received the benefit of the amended sentencing provision for MSR by filing a motion for

continuance so that he could be sentenced for this offense after the amended statute went into effect.

¶ 66    As in *Brown*, defendant cannot establish that he was prejudiced where he cannot show a reasonable likelihood existed that the court would have granted such a motion. *Brown*, 2022 IL App (1st) 190812-U at ¶ 53. A trial court's decision to grant or deny a motion to continue is a discretionary matter and will not be set aside unless it amounts to an abuse of discretion. *People v. Segoviano*, 189 Ill.2d 228, 245 (2000). Because trial courts have discretion to grant or deny a motion to continue a hearing, and under the facts of this case, defendant cannot show that the trial court would have granted a continuance if his attorney had requested one.

¶ 67    "All motions for continuance are addressed to the discretion of the trial court and shall be considered in light of the diligence shown on the part of the movant." 725 ILCS 5/114-4(e) (West 2013). "The factors to be considered in evaluating a trial court's exercise of its discretion include the diligence of the movant, the right of the defendant to a speedy, fair and impartial trial, and the interests of justice. *Id*. Other factors that might be considered include the history of the case, the complexity of the matter, the seriousness of the charges, docket management, judicial economy, and inconvenience of the parties and witnesses. *People v. Walker*, 232 Ill.2d 113, 131 (2009). We are also mindful that, in the context of posttrial activity, our supreme court has also declared that posttrial activity, including the imposition of sentence, may not be indefinitely postponed, because public policy and the effective enforcement of the criminal law require reasonable administrative promptness where specific time limitations are not imposed. *People ex rel. Houston v. Frye*, 35 Ill.2d 591, 593 (1966).

¶ 68    Here, at the time of sentencing, almost four years had passed since the time of the offense and over seven months had passed since defendant had been found guilty on September 16, 2020.

Notably, defendant's sentencing hearing was originally scheduled for October 14, 2020, then again on December 15, 2020, before the Act had been passed by the legislature on January 13, 2021, and again on February 11, 2021, before the governor signed into law on February 22, 2021. The trial court had already continued the sentencing hearing the first two dates because the pre-sentencing investigation report could not be located. The trial court had also continued the sentencing hearing for additional two-month period because defense counsel had expressed difficulty communicating with defendant as a result of a quarantine order in the jail. While the passage of time since the offense was committed was shorter compared to *Brown*, the length of time since the defendant was found guilty in *Brown* was significantly shorter at 37 days compared to seven months. *Brown*, 2022 IL App (1st) 190812-U, ¶ 53.

¶ 69    Defendant's reliance on the presence of other factors does not persuade us that trial counsel was ineffective for failing to request such a motion to continue, given the history of this particular case. Thus, as in *Brown*, defendant has not shown a reasonable likelihood exists that the court would have granted a continuance of an additional three months for defendant "to take advantage of legislation that the legislature had not otherwise endeavored to make applicable to defendant." *Id*.

¶ 70    Defendant also cannot establish that his trial counsel's performance fell below an objective standard of reasonableness. To support a finding that trial counsel's performance was deficient for failing to move to continue where there is a change in the sentencing law, defendant relies on *United States v. Abney*, 812 F.3d 1079 (D.C.Cir. 2016). However, the facts in *Abney* are distinguishable. In *Abney*, the defendant pled guilty to a drug offense and was sentenced five days after the House had passed the Fair Sentencing Act (FSA) and the day before President Obama signed it into law. *Id*. at 1083-84. The new law changed the mandatory minimum sentence for the

defendant's offense from 10 years to 5 years' imprisonment. The defense counsel in *Abney* did not seek a continuance for the sentencing hearing and, during a discussion with the prosecution and the district court at the sentencing hearing regarding its applicability, indicated that he believed the FSA would not be applied retroactively to people who committed crimes before the bill became law. *Id*. at 1084. On appeal, the D.C. Circuit Court reversed the district court's denial of the defendant's motion to reconsider, which included a claim of ineffective assistance of trial counsel. *Id*. at 1083.

¶ 71　　In finding that there was "no conceivable strategy that would justify the failure of Abney's counsel to seek a continuance of sentencing[,]" the court looked to whether a reasonable attorney would determine that there was a reasonable probability of successfully reducing the defendant's sentence by seeking a continuance. *Id*. at 1088. The court found that "[t]he FSA's impending enactment was so important and widely publicized – and the reasonable likelihood of its retroactive effect so apparent – that objectively reasonable counsel would have known about it and the open retroactivity question," and therefore would have sought a continuance. *Id*. The court based its finding on the fact that both the district court and the government had recognized at sentencing that the FSA might be deemed retroactive, and the defense bar was seeking continuances for similarly situated defendants at this time. *Id*. at 1089. Further, the trial court stated that it would have imposed a lesser sentence if it had the discretion to do so.

¶ 72　　Here, there is no evidence that the enactment of this Act was "so important and widely publicized" at the time of defendant's sentencing. As defendant concedes, there is no evidence that trial counsel, or for that matter, the prosecution and the trial court, knew about the passage of this Act. And, unlike in *Abney*, there is no evidence that "the defense bar was seeking continuances for similarly situated defendants" regarding the passage of this Act. Moreover, in *Abney*, there was a

need for a continuance because there remained an open question as to whether the FSA would apply retroactively to this defendant. In sharp contrast, in the instant case, there was no remaining open question as to whether this Act was applicable to defendant at the time that his sentencing hearing was scheduled on April 8, 2021.

¶ 73    Additionally, we recognize that in *Downs v. United States*, 879 F.3d 688 (6th Cir. 2018), the reviewing court declined to take the same view as *Abney*. Finding that defense counsel's decision to not seek a continuance as a failure of "foresight" as opposed to "strategy", the court ruled that defense counsel "was not constitutionally incompetent when he failed to foresee that the Act's reduced penalties would apply to crimes committed before the Act's effective date." *Downs*, 879 F.3d at 690-691. The court emphasized that, pursuant to *Strickland*, counsel's decisions must be evaluated based on "'counsel's perspective at the time.'" *Id*. (quoting *Strickland*, 466 U.S. at 689).

¶ 74    Thus, we find that defendant has not established that his trial counsel's performance fell below an objective standard of reasonableness or that the trial court would have granted a request to continue the sentencing hearing for nearly three additional months so that he could take advantage of a change in law. Defendant's sentence is affirmed.

¶ 75                                        CONCLUSION

¶ 76    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 77    Affirmed.