2024 IL App (1st) 1200168-UB

Nos. 1-20-0168 and 1-23-1004 (Consolidated)

FIRST DIVISION
September 30, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 1488 |
| | ) | |
| BERNARD BASHUM, | ) | |
| | ) | The Honorable |
| Defendant-Appellant | ) | James B. Linn, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:* At the preliminary *Krankel* hearing conducted on remand, the trial court erred in determining that defendant had not shown possible neglect by his trial counsel. We remand for the limited purpose of a full *Krankel* inquiry, with the appointment of counsel, regarding defendant's *pro se* claims of ineffective assistance of trial counsel. Additionally, jurisdiction is retained.

¶ 2    Following a jury trial in which he testified that he acted in self-defense, defendant Bernard Bashum was convicted of first degree murder in the death of Curtis Sanderbeck. Defendant was sentenced to 22 years' imprisonment. In a prior order upon his direct appeal, we remanded for the trial court to conduct a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) into defendant's *pro se* posttrial claims of ineffective assistance of counsel, without addressing his other claims of trial error. *People v. Bashum*, 2022 IL App (1st) 1200168-U. Upon remand, the

trial court held a preliminary *Krankel* hearing but found no possible merit to defendant's claims of ineffective assistance. Defendant appealed from that ruling (no. 1-23-1004), which was consolidated with his prior appeal.

¶ 3        On appeal, defendant maintains his three original claims of trial error: (1) the trial court erred in a pretrial ruling barring him from introducing evidence pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984); (2) his trial counsel was ineffective for failing to present the testimony of Sanderbeck's brother regarding Sanderbeck's propensity for violence; (3) the trial court erred in providing a non-pattern jury instruction for second-degree murder.

¶ 4        Alternatively, with regard to the preliminary *Krankel* hearing conducted on remand, defendant asserts that the trial court erred in failing to find "possible neglect" by his trial counsel, such that he is entitled to a full *Krankel* hearing with appointed counsel. Defendant otherwise argues that he is at least entitled to another preliminary *Krankel* hearing, because he lacked access to all of his papers when the hearing was conducted.

¶ 5        For the following reasons, we find that the trial court erred in denying any relief after the preliminary *Krankel* hearing. Specifically, defendant alleged at least possible neglect by his trial counsel in failing to call three witnesses that would testify that Sanderbeck was involved in fights shortly before the incident involving defendant. Thus, we remand for the trial court to conduct a full *Krankel* hearing with the appointment of counsel for defendant.

¶ 6                                                    BACKGROUND

¶ 7        On July 17, 2017, Sanderbeck was beaten behind a strip mall in the 1200 block of South Clinton Street, in Chicago, Illinois. Sanderbeck died of his injuries on August 14, 2017. The State charged defendant and a codefendant, Larry Jones, with first degree murder and armed robbery. Jones subsequently entered into a plea agreement. In a separate indictment, the State charged

Ernest Mitchell with first degree murder and armed robbery in connection with Sanderbeck's death.[1]

¶ 8        In pre-trial proceedings, defendant was initially represented by an assistant public defender. Approximately eleven months before his jury trial commenced, the trial court granted leave for the assistant public defender to withdraw as counsel. Defendant was subsequently represented *pro bono* by Nicole Wing and other attorneys from the Vedder Price law firm.

¶ 9                                Pre-Trial Ruling on *Lynch* Evidence

¶ 10       Defendant asserted a claim of self-defense. In a pretrial motion, he sought to introduce testimony from a number of witnesses pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), but the trial court permitted testimony from only one of those witnesses.

¶ 11       Specifically, the trial court permitted defendant to elicit testimony from Glen Reed, a security guard from the Pacific Garden Mission homeless shelter (PGM). The court found that Reed was a proper *Lynch* witness because he would testify that Sanderbeck was barred from the shelter "because of fighting and intoxication and causing disturbances."

¶ 12       Defense counsel also sought to elicit testimony from a police officer, Anthony Winburn, who spoke to the victim's brother, Andrew Sanderbeck (Andrew). Defense counsel proffered that Winburn would testify that Andrew told him that Sanderbeck repeatedly threatened Andrew, which led to Andrew getting "a concealed carry [permit] to protect himself from his brother." The court denied defendant's request to call Winburn, because his testimony about what Andrew said would be hearsay. When the court asked defense counsel if Andrew was available to testify, defense counsel said that Andrew "lives in Philadelphia and is beyond our subpoena power."

---

[1] After a bench trial, Mitchell was found not guilty of first degree murder but was convicted of armed robbery. *People v. Mitchell,* 2022 IL App (1st) 210432-U (affirming Mitchell's conviction and sentence on direct appeal.)

¶ 13    Elsewhere during the same hearing, defense counsel indicated that it wanted to elicit *Lynch* testimony from two other witnesses, Benny Dam and Christopher Patterson, but acknowledged that its written motion had not mentioned Patterson. Counsel proceeded to argue as to why Dam's testimony should be admitted as *Lynch* evidence.

¶ 14    Defense counsel proffered that Dam would testify that Sanderbeck worked at Dam's mechanic shop. Sanderbeck often came to work drunk, yelled racist slurs, and threatened workers and clients. Defense counsel told the court that Dam would testify that he fired Sanderbeck due to his "drunk outrages and outbursts" and because he was "[s]tarting arguments with people and trying to get them to fight with him."  When the court asked if Dam would testify that Sanderbeck was in actual fights, counsel answered: "I don't believe so." The trial court denied defendant's request to call Dam as a *Lynch* witness. The court remarked that although Dam would testify that Sanderbeck was "an obnoxious person," one is not "allowed to use deadly force because somebody is obnoxious."

¶ 15    After the court ruled that it would not allow Dam's testimony, defense counsel made no proffer or argument regarding Patterson.

¶ 16                             Larry Jones

¶ 17    Jury trial commenced August 26, 2019. The State's first witness was co-defendant Larry Jones, who stated that he was incarcerated. He acknowledged that he entered a plea agreement under which, in exchange for his testimony in defendant's case, he pleaded guilty to robbery and expected to be sentenced to 20 years' imprisonment.

¶ 18    In the summer of 2017, Jones was homeless and resided at the PGM shelter. He knew defendant and Sanderbeck from the shelter.

¶ 19     Jones testified that each morning he would go to the Home Depot near the intersection of Clinton Street and Roosevelt Road, where he and a friend named Diamond made money by helping customers load purchases into their vehicles. Each morning, Sanderbeck would go to a nearby Jewel grocery store to buy drinks.

¶ 20     On the morning of July 17, 2017, Jones, Diamond and Sanderbeck were waiting for the Jewel to open in order to purchase alcohol. Jones testified that Sanderbeck indicated that he had cash on him because he picked up "some money from his boss." Jones testified that Sanderbeck said this in the presence of defendant (who was known as "Little Moe") and another man known as "Country," later identified as Mitchell.

¶ 21     While they were waiting for Jewel to open, Sanderbeck said "F them n***s messing with my tools and I'm going to be mad and upset." Jones recalled that defendant and Country "got offended" by Sanderbeck's racial slur and told him: "We gonna get you, we gonna jump on you." Jones told defendant and Mitchell not to harm Sanderbeck. Jones had heard Sanderbeck use this slur "all the time" and believed that Sanderbeck was "just like playing."

¶ 22     Jones later saw defendant with a "long pine stick." Jones asked him what he was doing, and defendant said "I'm gonna beat his ass." Jones told defendant not to do anything and asked him to put the stick by a dumpster behind a FedEx store.

¶ 23     Jones testified that he and Sanderbeck were drinking all morning. Later that day, around 5:00 p.m., Jones saw Sanderbeck laying on a cardboard box "trying to sober up." Jones saw defendant approaching with the stick. Jones also saw Mitchell pushing a shopping cart.

¶ 24     Jones recalled that defendant grabbed Sanderbeck by the back of his shirt, but Sanderbeck broke free. Jones testified that Mitchell "tricked" Sanderbeck by telling him to go to an area behind

a wall. Mitchell grabbed Sanderbeck, who was still "intoxicated," and threw him against the wall. Sanderbeck fell on the ground. He appeared to be "numb" and could not stand up.

¶ 25        Jones recalled that defendant started "stomping [Sanderbeck's] head in the concrete" with his feet, while Jones tried to pull defendant away. At some point, defendant grabbed the stick and beat Sanderbeck "in the face" while Jones tried to stop him.

¶ 26        Jones testified the attack stopped when a security guard arrived. Jones told the security guard that Sanderbeck needed medical attention. Jones remained until an ambulance came. Later that evening, police took Jones into custody.

¶ 27        Jones testified that after the beating, defendant put his shoes in a dumpster and put on different clothing. Jones admitted that he had taken $20 from Sanderbeck before the beating. Jones also admitted he took $40 from Sanderbeck's pocket after the beating, of which he gave $20 to defendant and $20 to Mitchell. Jones also had Sanderbeck's cell phone, but he claimed Sanderbeck gave it to him.

¶ 28        On cross-examination, Jones admitted that on the day of the incident, he told the police the fight started because Sanderbeck called defendant "the 'N' word." The second time he spoke to police, he told them the fight was caused by an argument about drinking. He also admitted he falsely told police that he never took money from Sanderbeck.

¶ 29        On redirect examination, Jones admitted he had lied to detectives repeatedly. However, he had consistently identified defendant as the person who beat Sanderbeck. Jones agreed that both he and Sanderbeck were drunk on the day of the beating.

¶ 30                                     Officer Avelar

¶ 31 Chicago police officer Avelar testified that he and his partner, Officer Wilson, responded to a call of a battery in progress around 5:16 p.m. near the strip mall.[2] They spoke to a security guard and toured the area. Behind the strip mall, they observed a body on the ground. The jury viewed body camera footage from the officers' arrival at the scene.

¶ 32 Around 6:45 p.m., Avelar observed individuals matching the description of possible offenders near the Home Depot, "standing on the other side of the wall of where I saw the victim lying." He detained defendant and found some money in his pocket. Shortly thereafter, he learned that Jones was detained nearby. On the same day, Avela spoke to Mitchell, who told him that defendant "had done the kicking and Mr. Jones had done the robbing." At the time, Avelar did not consider Mitchell to be a suspect.

¶ 33                                  Detective Anthony Winburn

¶ 34 Detective Anthony Winburn testified that he responded to the scene. He explained that the incident occurred "behind the strip mall which is technically on Clinton but the address still shows Canal." He described a walled area behind the building with dumpster and a "little cut in the wall where you can kind of walk in and walk out."

¶ 35 Winburn and an evidence technician reviewed the scene. They observed spots of suspected blood, a vodka bottle, and "two pieces of wood that looked like a stick that had been broken in two." He estimated that the stick was 30 or 35 inches in length. Winburn testified that Mitchell was at the scene but left after speaking to police.

¶ 36 Winburn met with defendant two days later, July 19, 2017. On that date, a T-shirt and black pants and socks were recovered from defendant.

¶ 37                                  Detective Ruben Sanchez

---

[2] Avelar did not state his first name on the record.

¶ 38    Detective Ruben Sanchez testified he became involved in the case after Sanderbeck died on August 14, 2017. In his investigation, he learned that Mitchell's nickname was "Country."

¶ 39    In November 2017, Jones was taken into custody. After Sanchez spoke to Jones, he learned that Mitchell may have been involved in the beating. In February 2019, Sanchez spoke with a Home Depot customer who also identified Mitchell.

¶ 40    Sanchez had reviewed body camera video from responding officers, as well as Home Depot surveillance video from the time of the incident. The Home Depot video did not capture the actual beating, but it showed an area across the street from where it occurred. Video footage showed that about 5:15 p.m. on the day of the incident, Tyron Willis, who was also known as "Diamond", was speaking to Jones and Mitchell. A fire truck arrived at the scene at approximately 5:23 p.m. At approximately 6:16 pm., the video showed defendant with Jones and Mitchell.

¶ 41    The State offered forensic evidence that Sanderbeck's DNA was found in swabs from blood stains on clothing recovered from defendant. Sanderbeck's DNA was also found on the two pieces of wood at the scene.

¶ 42                              Michael Watson

¶ 43    Michael Watson testified that he worked for Allied Universal, which provided security services for the Jewel store at 1340 S. Canal Street.  Watson became acquainted with Sanderbeck after he was asked to escort Sanderbeck out of the store for "having words" with someone. Following that incident, Watson "developed a rapport" with Sanderbeck and spoke to him on days that Watson worked at the Jewel. Watson often saw Sanderbeck while making his rounds.

¶ 44    On July 17, 2017, Watson began his shift at 6:00 a.m. Around 9:45 a.m., he and Sanderbeck greeted each other. Sanderbeck said he was going to a "PLS check cashing place because someone was going to wire him some money." Later that morning, Watson observed Sanderbeck coming

towards the Jewel and talking "with a few guys that he was drinking with." Watson recognized some of those men, whom he knew as Larry, Diamond, Country and Little Moe. Watson had regularly encountered the men during his work as a security guard. Watson identified defendant in court as Little Moe. He identified photographs of Larry, Diamond, and Country.

¶ 45    Watson recalled the men were drinking beers and having a conversation. He saw Sanderbeck pull out "a wad of money" and give some to defendant. Watson noticed the wad because it was "so big", estimating it contained about $500. After Sanderbeck gave some cash to defendant, defendant went into the Jewel and purchased alcohol. Watson recalled that defendant was the only one of the men who had not been barred from the store. The men continued to drink and buy "extra shots." The next day, Watsson learned that Sanderbeck had been robbed and beaten.

¶ 46    On cross-examination, Watson agreed he never heard about any plan to rob Sanderbeck. Watson did not see any physical altercation.

¶ 47    Johann Kirschenger

¶ 48    Johann Kirschenger testified that he and his young daughter went to the Home Depot store on the afternoon of July 17, 2017. After leaving the store they went to his car, which was parked near the store's exit. Across the street from the store was the back of a strip mall.

¶ 49    While in his car, Kirschenger noticed four black males and a "Hispanic" male, later identified as Sanderbeck. One of the black men was about 6 feet 6 inches, two were roughly "five-ten, 160," and a smaller man was about five feet six inches tall and 120 pounds. He noticed the shorter man was "lean, ripped" with his abs showing. He "could tell there was something going on there, like distress, and the large male was pointing at the Hispanic male, then pointing at *** the black males." He testified that the black men would "square off" with Sanderbeck and after the large man pointed, "the other guys would like flank him to go to the left or right to be getting

around" Sanderbeck. He recalled that at least two times, the black men "circle[d] around back trying to be getting him."

¶ 50　　At one point, the largest man gestured toward Sanderbeck "pointing like go back there." Kirschenger then saw all five men go behind "a block screen wall which hides the trash *** dumpsters" for the strip mall. The wall was about ten feet tall, and he could not see what happened behind it.

¶ 51　　As Kirschenger was driving away, he looked back toward the wall and saw "a piece of wood like fly up." He stopped the car and told his daughter to call 911. Kirschenger went back to the area and saw Sanderbeck laying on his back while the other men were leaving. Kirschenger stayed at the scene until police arrived. As he left, he noticed that the largest male "was by the Home Depot doors" with someone else.

¶ 52　　Kirschenger never saw Sanderbeck throw a punch or hit any of the other men. He agreed he did not see any physical contact between defendant and Sanderbeck, and he did not see any robbery.

¶ 53　　　　　　　　　　　　　Adam Ortiz

¶ 54　　Adam Ortiz testified that he was a security guard for Villareal Security on July 17, 2017, which was his first day working at the South Loop Plaza. Part of his job was to patrol the parking lot. Another security officer, Ricky, trained Ortiz as they made rounds. Ricky introduced Ortiz to a number of homeless men in the area, including a man known as Little Moe and a man named Larry. He was also introduced to a man wearing a mechanic's uniform, who was later identified as Sanderbeck. Ortiz saw the same men a number of times that day as he made his rounds.

¶ 55    Around 5:00 p.m., Ortiz's supervisor told him there were some homeless men "where they're not supposed to be," behind a FedEx store, and asked Ortiz to get them to move. Ortiz explained the area behind the store was walled and contained trash receptacles.

¶ 56    When Ortiz and his supervisor went to the area, they saw Sanderbeck laying on the ground, whom Ortiz recognized as the man wearing the mechanic's uniform. Ortiz noticed blood on Sanderbeck's face and that his nose appeared to be "beaten in." When paramedics placed Sanderbeck in a stretcher, Ortiz noticed a "gash on the back of his head."

¶ 57    Later that evening, Ortiz saw Little Moe and Larry together, across the street near the Home Depot. Oritz noticed blood stains on Larry's sweater. The following day, Ortiz identified Little Moe in a photo array. Ortiz acknowledged that he did not see defendant fight or rob anyone, and he did not see defendant with a stick.

¶ 58                                    Medical Evidence

¶ 59    The parties stipulated that Sanderbeck suffered lacerations and abrasions to the back of the head and that he had an acute subdural hematoma. His blood alcohol level corresponded to a blood alcohol content of .295.

¶ 60    Lauren Woertz, an assistant medical examiner for Cook County, testified about Sanderbeck's autopsy. He was five feet and eight inches tall and weighed 135 pounds. He had a subdural hematoma, or bleeding on the brain, caused by blunt force trauma. His injuries were consistent with someone who was stomped or kicked. Sanderbeck died of complications resulting from the hematoma, including brain damage.

¶ 61                                    Ernest Mitchell

¶ 62      Before Ernest Mitchell testified, the court explained to the jury that he was testifying in defendant's case under use immunity, meaning his testimony could not be used against him at a future trial.

¶ 63      Mitchell testified that he was sometimes known as "Country." In July 2017, he resided at PGM. He frequently saw Sanderbeck, defendant, Jones, and "Diamond."

¶ 64      Mitchell recalled that on the day of the incident, Sanderbeck was "spending a lot of money" buying alcohol. He recalled that Jones and defendant discussed a plan to "trick" Sanderbeck to go "behind the wall" so they could get Sanderbeck's money and his phone. Across the street from the Home Depot, there was a walled area with dumpsters. Sanderbeck had "laid [his] phone down on the side of the wall." At one point, Sanderbeck asked where his phone was and "Larry [Jones] told him it's back there by the wall." After Sanderbeck went to look for his phone, defendant grabbed him and "thr[e]w him against the wall," striking his head, while Jones stood nearby. Defendant then "start[ed] stomping" and kicking Sanderbeck. At one point, defendant began beating Sanderbeck with a stick, after which Jones "tr[ied] to pull him off." He estimated defendant hit Sanderbeck about 25 times with the stick. The stick eventually broke, and defendant threw it in a dumpster.

¶ 65      Mitchell recalled that, after the beating, Jones removed cash from Sanderbeck's pockets and gave some to defendant. Defendant threw his shoes in a dumpster and walked away.

¶ 66      Mitchell stated that he flagged down a detective and spoke with police on that day. Mitchell denied that Sanderbeck threatened defendant or "thr[ew] any punches."

¶ 67                           Balvina Ranney

¶ 68      Cook County deputy sheriff Balvina Ranney testified that she works at the criminal court building. On July 24, 2018, as she helped transport defendant to a court appearance, she saw him

hand a piece of paper to Jones. She took the paper from Jones, which was a folded letter. The contents of the letter were published to the jury. In the letter, defendant told Jones that the State would likely offer him a plea deal "in which they will ask you to get on the stand against me." He told Jones: "As long we work together and don't allow the State to come between us, I can guarantee we go out the front door."

¶ 69                                    Defendant's Trial Testimony

¶ 70        Defendant elected to testify in his own defense. He recalled that around the time of the incident, he was homeless and stayed at PGM or in a nearby tent community.

¶ 71        On July 17, 2017, he and a friend named Shawna purchased some beer and then went "behind the wall across the street from Home Depot." Defendant and his friends had gone there because it was a place they could drink without being bothered by police. When they arrived, they saw Jones, Mitchell, Diamond and Sanderbeck. Defendant testified that he hung out with the same group "every day."

¶ 72        Defendant recalled that during the day, a man named Christopher Patterson arrived. Defendant knew Patterson from the PGM shelter. Patterson and Sanderbeck "got into a fight where [Sanderbeck] swung on him and called him a n***."

¶ 73        Defendant also testified there was an incident at the PGM shelter two or three weeks earlier, in which Sanderbeck attacked someone because they disagreed about what to watch on television. Defendant testified that he had heard about other fights involving Sanderbeck. Defendant also recalled Sanderbeck told him that he had "pulled a knife on his boss and put it to his boss's neck because his boss didn't pay him on time."

¶ 74        Defendant recalled that on July 17, 2017, "[w]e drunk a couple fifths of vodka" that Sanderbeck purchased. At one point, Sanderbeck accused defendant of drinking all the liquor.

According to defendant, Sanderbeck said "drunk people are only good for taking from my people." When defendant asked Sanderbeck what he was talking about, Sanderbeck "said, you n\*\*\*\*s."

¶ 75    Defendant testified he was upset when Sanderbeck used the racial slur. Asked how he responded, he testified: "I grabbed [Sanderbeck], and I pushed him against the wall. I slammed him, and I kicked him several times." He did so "[b]ecause he made me mad by saying the word n\*\*\*."

¶ 76    Defendant testified that Sanderbeck got up and left. A few minutes later, Sanderbeck returned and came toward defendant with a switchblade knife. Sanderbeck said "I'm going to f\*\*\*ing get you" and said "he was going to cut [defendant] from ear to ear." At that point, defendant picked up a stick and hit Sanderbeck twice, causing the stick to break into two pieces. Defendant stated that he walked away and had no further contact with Sanderbeck.

¶ 77    Defendant testified that Mitchell picked up the knife and put it in his shopping cart. Defendant also saw Jones going through Sanderbeck's pockets. About an hour later, defendant saw Jones near the Home Depot. Jones gave defendant $20 and asked him to go to the Jewel to buy alcohol for him.

¶ 78    Defendant testified that he was more fearful of Sanderbeck than he otherwise would have been because "he had been violent before." He also said that when Sanderbeck "used the N word, it made me mad. It made me want to beat him up."

¶ 79    On cross-examination, defendant testified that he was known as "Little Moe." He acknowledged that on the day in question, he knew that Sanderbeck had money because Sanderbeck had given him money to buy alcohol. He admitted that he slammed Sanderbeck against the wall, slammed him against the ground, and kicked and stomped him. At that point, he was upset at Sanderbeck's use of the "N word" but Sanderbeck had not yet threatened him. Defendant

maintained that Sanderbeck walked away but returned minutes later with a knife. Defendant denied there was any plan to rob Sanderbeck, or that he took any money from him.

¶ 80        Defendant admitted that in the letter he passed to Jones, he wrote: "I believe we might be forced to say it was self-defense. If so, we know Curt was the aggressor. I tried to walk away but he ran up behind me. I defended myself. I attempted to leave again. He came at me with a knife. I picked up the closest thing to me and defended myself."

¶ 81                                 Glen Reed

¶ 82        Glen Reed testified that he formerly served as PGM's director of security. Reed recalled there were instances where Sanderbeck "use[d] the N word when he was intoxicated." He testified there were at least four times when Sanderbeck had to be physically removed from PGM because he became "irate," "was using the N word a great deal and pretty much inciting a riot." He testified that in those situations, security was able to intervene before there was physical violence. There was another incident where security "had to pull [Sanderbeck] out of a guy's face," but Sanderbeck kept verbally antagonizing the other man as he was pulled away.

¶ 83        Reed testified that he banned Sanderbeck from PGM "for his protection" because he was concerned about others attacking him. He thought it was "too volatile" for him to stay at PGM.

¶ 84        On cross-examination, Reed acknowledged that he did not see Sanderbeck strike anyone and was not aware of any incidents where he did. He agreed that the reason Sanderbeck was barred from PGM was for Sanderbeck's safety.

¶ 85        On redirect examination, Reed said Sanderbeck used the "N word" in a "very negative" way that was "very offensive." He testified there were four instances involving Sanderbeck that were on the verge of a physical alteration.

¶ 86    In rebuttal, the State published an additional letter from defendant to Jones. In that letter, he discussed their self-defense theory, the need for them to communicate and get corroborating witnesses for their story, and potential sentencing.

¶ 87    During closing argument, defense counsel argued that defendant acted justifiably in self-defense after Sanderbeck came at him with a switchblade. Counsel also told that jury that, even if it found that the State proved first degree murder beyond a reasonable doubt, it should find second degree murder because of mitigating factors. That is, counsel argued that defendant had an "earnest belief" that he was justified, or that defendant was "acting under serious provocation."

¶ 88    Following closing argument and jury instructions, the jury found defendant guilty of first degree murder.

¶ 89    At the conclusion of defendant's jury trial, defense counsel filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for a new trial.

¶ 90    While this motion was pending, defendant filed a *pro se* motion for appointment of counsel other than the public defender. In this motion, he alleged that the assistant public defender and *pro bono* private counsel were ineffective because they were "unconcerned" with his defense and did not "investigate zealously." Among other allegations, he claimed his counsel did not review "criminal discovery" with him, failed to file necessary pretrial motions, failed to keep him informed of his case's status, and "refuse[d] to call witness[es] on his behalf."

¶ 91    The trial court held a hearing on the posttrial motion filed by defense counsel, and thereafter denied it. However, the trial court did not address the posttrial motion filed by defendant *pro se*.

¶ 92    Following a sentencing hearing, the trial court sentenced defendant to 22 years' imprisonment, *i.e.* two years above the minimum of the 20 to 60-year range.

¶ 93                        Prior Appellate Proceedings

¶ 94        Defendant filed a direct appeal, commencing appeal no. 1-20-0168.  In his brief, defendant primarily asserted that three errors deprived him of a fair trial. In the alternative, he sought remand for a preliminary *Krankel* hearing because the trial court had not conducted an inquiry into his *pro se* posttrial claims of ineffective assistance. In its response, the State denied that there was trial error but conceded that defendant was entitled to a preliminary *Krankel* hearing.

¶ 95        In an order filed in August 2022, this court determined that the trial court should hold the preliminary *Krankel* hearing regarding the *pro se* claims of ineffective assistance, before addressing the separate claims of trial error. *Bashum*, 2022 IL App (1st) 1200168-U. Therefore, we remanded this case to the trial court with directions for the limited purpose of "conduct[ing] a preliminary *Krankel* inquiry into the factual basis of defendant's *pro se* posttrial allegations of ineffective assistance of counsel to determine if it shows possible neglect of the case warranting the appointment of new counsel thereunder."

¶ 96                               Proceedings on Remand

¶ 97        On remand, the parties appeared before the court on March 1, 2023. When the trial court asked defendant to explain his claims of ineffective assistance, he asked for a 30-day continuance because he did not have all the relevant documents. The matter was continued to April 3, 2023.

¶ 98        On April 3, 2023, the trial court stated that "the county jail reached out" and informed the court that there were  several "giant boxes of materials and they were having trouble getting them to [defendant]." The court remanded defendant back to the Department of Corrections in order for him to be able to review all the papers. The court set the next hearing date as May 24, 2023.

¶ 99        When the parties appeared at the next hearing date, defendant stated that he still had not received his papers. The court then asked defendant if he was "able to just tell me what your complaints are about [trial counsel] Ms. Wing and what happened at the trial ****? Are you able

to articulate that verbally to me?" Defendant answered that he could. The court then asked defendant to explain his claims of his counsel's ineffectiveness.

¶ 100      Defendant stated that in cross-examining the State's witnesses, there was "basically no opposition put up at all" by his counsel. When the court asked what his trial counsel should have asked, defendant answered that he was "not ready to elaborate *** because I don't have my transcripts." However, defendant indicated that he was ready to argue other issues.

¶ 101      Defendant then averred that trial counsel should have called Ricardo Palacios as a witness. Defendant stated that Palacios was the supervisor who was training security guard Adam Ortiz on July 17, 2017. Defendant indicated that Palacios would contradict Ortiz's testimony that his supervisor introduced him to an individual named Little Moe.[3] Defendant further stated that Palacios should have been called to testify because he told police that Sanderbeck "had an altercation with a guy a couple days beforehand."

¶ 102      The court asked Wing why she did not call Palacios. She acknowledged that she had been aware of Palacios but determined there was no reason to elicit his testimony because there "was no issue of identification of the defendant" as was "this was a case of self-defense."

¶ 103      At a later point in the hearing, defendant stated that Palacios should have been called to testify to show that Sanderbeck "had a violent nature." He also claimed Palacios's testimony would indicate a reason for Sanderbeck to be "carrying a weapon, because he had been having altercations in the area." The trial court did not ask Wing as to the particulars of any discussion she had with defendant about Palacios with defendant, although Wing did not deny that she spoke to defendant about Palacios. However, she told the court that "we lost our motion as to *Lynch* material," apart

---

[3] The court asked defendant whether he was Little Moe. He answered that "Little Moe" is a nickname used for younger members of a gang, and that "I am not the only Little Moe in the city of Chicago." Defendant stated he was not the "Little Moe" that Ortiz referred to.

from the ruling allowing Reed's testimony. The court responded: "So you tried. *** I am the one that kept it out. Not that you didn't try to get it in, but I kept it out, right?" Wing responded: "That's correct."[4]

¶ 104        Elsewhere during the preliminary *Krankel* hearing, defendant said that he gave trial counsel information on how to find a person known as "Big G," also known as "Bo."[5] Defendant asserted that Palacios' statement to police indicated that Sanderbeck had a prior fight with Big G, and so Big G could testify to Sanderbeck's "nature for violence." Wing did not deny that she discussed Big G with defendant, although Wing said she did not "remember the circumstances regarding the facts of that specific person." Wing also told the court: "Again, we were handcuffed by the court's order regarding *Lynch* material."

¶ 105        Elsewhere during the hearing, defendant also claimed counsel should have contacted Christopher Patterson, who "had a fight with [Sanderbeck] the same day" of the incident. He claimed that his counsel "did in fact find him but they never contacted him."

¶ 106        The court asked Wing about Patterson. She answered: "I don't recall that person. It would be in our investigative notes as to whether or not this was somebody that we tracked down. I am certain if [defendant] directed us to him we made efforts to find him, and if we found him, we would have spoken to him. It also might have been an issue of not being able to use testimony from that person based on not being allowed to use *Lynch* material." However, Wing acknowledged that she "d[id] not remember the circumstances surrounding the investigation of that particular person."

¶ 107        During the hearing, Wing stated that her firm hired investigators that likely spent "at least a hundred hours interviewing witnesses that were raised in the police reports and raised by

---

[4] The record reflects that defense counsel did not proffer Palacios before trial as a *Lynch* witness.
[5] For simplicity, we will refer to this person only as "Big G."

[defendant] in order to determine the best witnesses to be used at trial, all of which was discussed with [defendant]." However, the record does not reflect whether Wing had access to any investigative notes during the hearing.

¶ 108      Separately, defendant also suggested that his counsel pressured him to proceed by jury trial, when he desired a bench trial. He said he would have chosen a bench trial because "it was a matter of law. I have a law-based case, and what my attorneys w[ere] suggesting is that they w[ere] looking for sympathy in regards to my homeless situation *** which was not related to the facts and evidence of the case." In response to this claim, the court remarked that if it "had heard this as a bench trial, I wouldn't have taken as long as the jury did to come back and find you guilty."

¶ 109      Defendant made several other claims of error by trial counsel which are not necessary to recount in detail for purposes of this appeal. Generally, defendant asserted that Wing was "disengaged and unconcerned" with his defense, that she should have moved to quash his arrest and suppress certain evidence, that she failed to elicit certain evidence, that she made erroneous remarks in closing argument, and that she "failed to challenge a non-jury pattern instruction" in a post-trial motion.

¶ 110      At the conclusion of the preliminary *Krankel* hearing, the court found that defendant had not raised any points that warranted the appointment of counsel for a full hearing. It noted that from its observations at trial, it was confident that Wing "competently and ethically represented" defendant and there is "no way *** that you could ever say that this falls within any suggestion of incompetence or ineffectiveness."

¶ 111      On the same date that the court denied relief, defendant filed a notice of appeal, commencing appeal no. 1-23-1004. That appeal was subsequently consolidated with appeal 1-20-

0168. The parties have now submitted supplemental briefs addressing the preliminary *Krankel* hearing conducted on remand.

¶ 112                                    ANALYSIS

¶ 113        On appeal following the preliminary hearing on remand, defendant maintains his initial claims of trial error that were briefed before our 2022 order remanding for a preliminary *Krankel* inquiry. Alternatively, he asks this court to remand for a full *Krankel* inquiry with the appointment of counsel, because the preliminary *Krankel* hearing showed possible neglect by his trial counsel. He otherwise asks that, "at minimum," we should remand for another preliminary *Krankel* inquiry because he lacked access to his legal documents at the time of the hearing on remand.

¶ 114        Based on our review of the record, we believe the preliminary hearing showed at least possible neglect by trial counsel, insofar as defendant identified three potential witnesses (Palacios, Big G, and Patterson) who could have provided *Lynch* evidence as to Sanderbeck's history of violence. Notably, the record is clear that trial counsel did not proffer these specific witnesses in its pre-trial *Lynch* motion. Thus, defendant is entitled to a full *Krankel* hearing with the appointment of counsel.

¶ 115        As a procedural matter, we note the parties disagree as to whether this court should address the arguments pertaining to the preliminary *Krankel* hearing before addressing the merits of defendant's claims of trial error. Defendant urges that we should first resolve his claims of trial error, whereas the State asks that we follow the approach in our August 2022 order and "resolve defendant's *Krankel* issues first and, in the event of remand, retain jurisdiction." The State posits that "if *arguendo*, this Court determines that an additional remand is required for additional preliminary inquiry or a full *Krankel* hearing with appointment of counsel, it need not consider defendant's other arguments in this appeal."

¶ 116    The State's approach is consistent with our prior order and the overall purpose of *Krankel* hearings—to allow the trial court to properly assess *pro se* claims of ineffective assistance. In our August 2022 order, we determined that it was appropriate to remand for a preliminary *Krankel* hearing before addressing the claims of trial error, citing precedent that a reviewing court may remand for *Krankel* proceeding while retaining jurisdiction as to remaining claims of error. See *People v. Bell*, 2018 IL App (1st) 151016; see also *People v. Roberson*, 2021 IL App (3d) 190212, ¶ 22 (in remanding for trial court to conduct an adequate preliminary inquiry, recognizing "it would be premature for this court to consider the remaining contentions raised in this appeal"). Our August 2022 order also recognized that "a resolution of the allegations raised in his *pro se* posttrial motion" claiming ineffectiveness of trial counsel "could have an impact on one of the issues raised on direct appeal." *Bashum*, 2022 IL App (1st) 1200168-U, ¶ 17.

¶ 117    Since our prior order remanded to the trial court to conduct a preliminary hearing pursuant to *Krankel*, we think it is consistent that we first assess defendant's claims arising from that hearing. Moreover, this aligns with the principle that the purpose of *Krankel* is to allow the trial court to resolve "*pro se* ineffective assistance claims" and "to limit issues on appeal." *People v. Jackson*, 2020 IL 124114, ¶ 95; *People v. Ayres*, 2017 IL 120071, ¶ 13 ("the goal of any *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal."). Thus, we will proceed to address defendant's arguments that he is entitled to a full *Krankel* hearing with the appointment of counsel, because the preliminary hearing revealed "possible neglect" by his trial counsel.

¶ 118                                   *Krankel* Procedures and Standard of Review

¶ 119    We review the governing law for assessing post-trial *pro se* claims of ineffective assistance of counsel. The common law procedure developed from the decision in *Krankel* is triggered when a

defendant raises a *pro se* claim of ineffective assistance of trial counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. "This procedure serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claim and is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." *Jackson*, 2020 IL 124114, ¶ 95.

¶ 120      The trial court is not automatically required to appoint new counsel when this type of claim is raised. *Ayres*, 2017 IL 120071, ¶ 11 (citing *Jolly*, 2014 IL 117142, ¶ 29). Rather, the law requires the trial court to conduct some type of inquiry into the underlying factual basis, if any, of the *pro se* posttrial claim of ineffective assistance. *Id.* An "adequate inquiry" is one that is "sufficient to determine the factual basis of the claims." *Id.* (quoting *People v. Banks*, 237 Ill. 2d 154, 213-14 (2010). A "trial court may consider both the facts and legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary inquiry stage." *People v. Roddis*, 2020 IL 124352, ¶ 70. In evaluating a *pro se* claim, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary." *Ayres*, 2017 IL 120071, ¶ 11. The trial court may discuss the allegations with defendant and may base its determination on its own knowledge of defense counsel's performance at trial. *Id.*

¶ 121      "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the trial court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.* (quoting *Jolly*, 2014 IL 117142, ¶ 29). "New counsel would then represent defendant at the hearing on the *pro se* ineffective assistance of counsel claim." *Roddis*, 2020 IL 124352, ¶ 36.

¶ 122 After a preliminary inquiry, "[t]he applicable standard of review depends on whether the trial court did or did not determine the merits of the defendant's *pro se* posttrial claims of ineffective assistance of counsel." *Jackson,* 2020 IL 124112, ¶ 98. Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question and is subject to *de novo* review. *Id.* "However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *Id.* "Manifest error is error that is clearly evident, plain, and indisputable.[Citations.]" *Id.*

¶ 123 Here, defendant suggests that the trial court committed manifest error on remand, when it declined to appoint counsel following the preliminary inquiry. Specifically, he urges the hearing showed "possible neglect" by trial counsel in four respects, three of which are substantially similar. Defendant claims there was possible neglect insofar as trial counsel did not investigate or call three witnesses—Palacios, Big G, and Patterson—who could have provided testimony that Sanderbeck had been in fights shortly before the incident involving defendant. He urges that such testimony would be admissible pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984) and would have corroborated his claim of self-defense. He claims such testimony would show that Sanderbeck had a violent nature and would also help explain why Sanderbeck would have been carrying a weapon. Thus, he suggests the possibility that trial counsel's failure to investigate and offer testimony from these three witnesses constituted deficient performance under the two-prong *Strickland* standard. Separately, defendant suggests the preliminary hearing showed possible neglect by his trial counsel in depriving him of his right to waive a trial by jury.

¶ 124 In assessing whether the preliminary hearing revealed possible neglect by trial counsel, we keep in mind the *Strickland* standard for assessing claims of ineffective assistance. "A defendant

alleging a claim of ineffective assistance of counsel must satisfy both prongs of the test discussed in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing that 'counsel's performance was deficient' and the deficient performance 'prejudiced the defense.' " *People v. Williams,* 2017 IL App (1st) 152021, ¶ 36.

¶ 125     The first prong requires defendant to show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The prejudice prong requires defendant to show a "reasonable probability" that, but for counsel's unprofessional errors, "the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

¶ 126     "If either prong of the *Strickland* test is not met, defendant's claim must fail. Thus, a reviewing court need not consider whether counsel's performance was deficient before determining whether the defendant was so prejudiced by the alleged deficiencies that he is entitled to a new trial." *People v. Perry,* 224 Ill. 2d 312, 349 (2007). "If an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, then that course should be taken, and the court does not need to consider the quality of the attorney's performance." *Williams*, 2017 IL App (1st) 152021, ¶ 36.

¶ 127     At the preliminary *Krankel* hearing, defendant claimed that trial counsel was deficient in failing to investigate three witnesses who could offer testimony about fights involving Sanderbeck in order to support his claim of self-defense. "Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005) (citing *Brown v. Sternes*, 304 F. 3d 677, 692 (7th Cir. 2002)). "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v. Domagala*, 2013 IL 113688, ¶ 38

(quoting *Strickland*, 466 U.S. at 691). This duty "includes the obligation to independently investigate any possible defenses. [Citation." *Id*.

¶ 128   Defendant urges that testimony from Palacios, Big G, and Patterson could have been admissible under *Lynch*. We agree. "In *Lynch*, our supreme court held that, when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor." *People v. Martinez,* 2021 IL App (1st) 182553, ¶ 35 (citing *Lynch*, 104 Ill. 2d at 200). "Pursuant to *Lynch*, evidence of the victim's violent character may be offered in one or both of the following circumstances:

> 'First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. ***
>
> Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether the defendant knew of this evidence at the time of the event is irrelevant.' " *Id*. (quoting *Lynch*, 104 Ill. 2d at 200).

¶ 129   According to the defendant's statements at the preliminary *Krankel* hearing (which were not directly contradicted by his trial counsel), Palacios and Big G could have testified that Sanderbeck had a fight with Big G a "couple days" before July 17, 2017. Defendant similarly

averred that Patterson could have testified that he fought with Sanderbeck earlier on the same day of the incident involving defendant.

¶ 130    Notably, trial counsel did not specifically deny that she was made aware of these three witnesses. She indicated that she did not have a specific recollection as to whether she investigated or contacted them. Further, the record makes clear that (contrary to certain remarks made by the trial court and Wing during the hearing on remand), none of these three witnesses was discussed in defense counsel's pretrial motion to offer *Lynch* evidence.[6] Thus, the record undermines trial counsel's suggestion at the preliminary *Krankel* hearing that she was "handcuffed by the court's order regarding *Lynch* material" with respect to these particular witnesses. That is, the trial court never had an opportunity to consider whether Palacios, Big G, or Patterson's testimony would be admissible. We thus find the preliminary hearing showed trial counsel was possibly deficient in failing to investigate whether Palacios, Big G, or Patterson could provide *Lynch* testimony about violence by Sanderbeck in the days and hours before the incident involving defendant.

¶ 131    Keeping in mind the "possible neglect" standard at the preliminary stage of *Krankel* proceedings, we also find a possibility that defendant could show *Strickland* prejudice resulting from his counsel's failure to introduce *Lynch* testimony from these three witnesses. That is, there is a sufficient possibility that this additional *Lynch* evidence would have been admitted to bolster defendant's self-defense claim, which could have impacted the result of trial.

¶ 132    In this regard, we note that the trial court's pre-trial ruling regarding *Lynch* evidence suggests that it would have admitted some or all of the additional *Lynch* evidence at issue here. Before trial, the court permitted defendant to elicit testimony from Reed, based on the proffer that

---

[6] The transcript of the pretrial hearing regarding *Lynch* evidence reflects that trial counsel briefly mentioned Patterson as a potential witness along with Dam. However, defense counsel did not actually make any proffer or argument to the trial court for the admission of Patterson's testimony.

Reed would testify about fights involving Sanderbeck. At the same time, the court precluded testimony by Dam because he was expected to testify merely that Sanderbeck was "obnoxious." According to the defendant's statements at the preliminary hearing, the witnesses at issue would offer testimony about two specific fights involving Sanderbeck, both of which were close in time to the defendant's interaction with him on July 17, 2017. That is, Palacios and Big G would testify about a fight a "couple days" earlier, and Patterson would testify that he was in a fight with Sanderbeck on the same day as Sanderbeck's encounter with defendant. That testimony would be much more specific than the testimony that Reed offered, particularly in terms of the closeness in time to the defendant's conduct. See *Martinez*, 2021 IL App (1st) 182553, ¶ 46 (where defendant claims self-defense, remoteness in time is a valid consideration in determining whether court erred in allowing evidence of the victim's violent character). It appears likely that, had trial counsel presented the trial court with this proposed testimony before trial, it would have allowed it pursuant to *Lynch.*

¶ 133    In turn, the jury would have been presented with significant additional evidence of Sanderbeck's violent character, in addition to what the jury heard from Reed and defendant. Had the jury heard testimony from Palacios, Big G, and Patterson that Sanderbeck was in two separate fights within days of the defendant's conduct, it could have lent more credibility to defendant's testimony that he knew Sanderbeck had a history of violence. If the jury heard that evidence, it might have viewed defendant's testimony differently.

¶ 134    We recognize the State's argument that defendant could not have been prejudiced by his counsel's failure to call these witnesses because their testimony would be "cumulative to other evidence regarding Sanderbeck's allegedly violent character." The State suggests that the

additional testimony from these individuals would not add anything to the evidence at trial because Sanderbeck's "violent character was already detailed by Reed's and defendant's testimony."

¶ 135     We disagree. First, Reed did not testify that he witnessed actual physical fights involving Sanderbeck. Rather, he testified that there were a number of times where Sanderbeck used offensive language against others in the shelter and had to be separated from other men to prevent fights. Indeed, Reed testified that Sanderbeck was expelled from the shelter for Sanderbeck's protection. This is substantially different from the testimony that Sanderbeck was involved in two separate physical altercations shortly before the incident involving defendant.

¶ 136     Moreover, we cannot say such testimony would merely be cumulative of defendant's trial testimony that he knew Sanderbeck had a history of violence. Certainly, defendant's testimony that he knew Sanderbeck had a reputation for violence may have been dismissed by the jury as self-serving. Yet, the jury's assessment of the evidence might be very different if it also heard from *other* individuals about two specific fights involving Sanderbeck in the days and hours before his encounter with defendant.

¶ 137     We again emphasize that at a preliminary *Krankel* hearing, a defendant needs only to allege "possible neglect" to be entitled to appointment of counsel. *Ayres,* 2017 IL 120071, ¶ 11. The *Lynch* evidence from Palacios, Big G, and Patterson discussed at the preliminary hearing would raise at least a reasonable possibility of a different result at defendant's trial, even if it would not lead to a self-defense acquittal. We keep in mind that the jury was also instructed regarding two mitigating factors that can reduce first degree murder to second degree murder. That is, it could have reached a different result if it found either that (1) defendant was acting in response to a serious provocation from Sanderbeck, or (2) that the defendant believed that his use of force was justified but his belief was unreasonable.

¶ 138     In sum, we find defendant alleged "possible neglect" by his trial counsel as it pertains to the failure to offer *Lynch* testimony from Palacios, Big G, and Patterson. This entitles him to appointment of counsel and a full *Krankel* hearing regarding his claims of trial counsel's ineffectiveness. As we find that defendant alleged possible neglect in this regard, we need not consider his additional argument that he alleged possible neglect by trial counsel pertaining to his right to elect a bench trial instead of trial by jury.

¶ 139     Finally, we note that, as in our August 2022 order, we will retain jurisdiction as to the other claims of trial error. We will consider those claims, if necessary, following further *Krankel* proceedings on remand.

¶ 140                                         CONCLUSION

¶ 141     For the reasons stated in this order, we remand this case to the circuit court of Cook County with directions to appoint counsel for defendant and conduct a full *Krankel* hearing into defendant's *pro se* allegations of ineffective assistance of counsel.

¶ 142     Remanded with directions; jurisdiction retained.